In the

# United States Court of Appeals
## For the Seventh Circuit

—————————

No. 18-2852

VIAMEDIA, INC.,

*Plaintiff-Appellant,*

*v.*

COMCAST CORPORATION and COMCAST CABLE
COMMUNICATIONS MANAGEMENT, LLC,

*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-05486 — **Amy J. St. Eve**, *Judge.*

—————————

ARGUED FEBRUARY 7, 2019 — DECIDED FEBRUARY 24, 2020

—————————

Before BAUER, HAMILTON, and BRENNAN, *Circuit Judges.*

Table of Contents

I.  The Markets and the Competitors .......................................7

   A. Cable Television: History, Revenue Sources, and
      Competition ......................................................................8

      1.  Television Programming and Advertising ..............8

  2. Revenue Sources: Competition and Cooperation 10

   a. Competition for Advertising Dollars and
    Cooperation Through Interconnects ................10

   b. Competition for Subscribers.............................15

    i. Growing MVPD Competition .....................16

    ii. Incumbent Cable Companies' Efforts to
     Stymie Competition for Subscribers ..........18

 B. The Ad Rep Services Market ........................................20

  1. The Role of Viamedia ..............................................20

  2. Vertically Integrated MVPDs .................................22

  3. Back to the Interconnects ........................................23

 C. Comcast Refuses Interconnect Access to Viamedia ...24

II. District Court Proceedings ..................................................35

III. Legal Standards and Analysis.............................................37

 A. Sherman Act Section 2—Illegal Monopolization........38

 B. Claims of Anticompetitive Conduct: Refusals
  to Deal and Tying............................................................41

  1. Refusals to Deal.......................................................44

   a. Monopolists and Refusals to Deal ....................44

   b. *Aspen Skiing* and Comcast.................................46

   c. Refusals to Deal and Motions to Dismiss ........54

    i. Comcast's Proposed Legal Standard..........57

    ii. Inapposite Vertical Integration Cases ........63

      2.  Tying ................................................................67

          a.  Summary Judgment Standard ..........................69

          b.  Tying and Comcast's Conduct ........................70

              i.  Definition.....................................................71

             ii.  Separate Products or Services .....................73

            iii.  Forced Purchase ...........................................75

  C.  Section 2 Monopolization: Harms, Efficiencies,
        & Remedies .......................................................84

      1.  Harm to Competition .............................................84

          a.  Ad Rep Services...................................................85

          b.  The MVPD Market: MVPDs, Advertisers,
             Cable Subscribers ................................................85

          c.  Back to the Interconnects ....................................88

      2.  Procompetitive Justifications? ................................91

          a.  The Interconnects .............................................92

          b.  The Ad Rep Services Market .............................93

      3.  Remedies .................................................................95

  D.  Antitrust Injury ................................................98

  E.  Role of Expert Witnesses...........................................102

      1.  Standard .................................................................103

      2.  Economic Expert Witness .....................................103

      3.  Lack of Expert Witness on Causation ...................104

Conclusion ...............................................................................105

HAMILTON, *Circuit Judge*. Plaintiff Viamedia, Inc. has sued defendant Comcast Corporation for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Viamedia accuses Comcast of using its monopoly power in one service market to exclude competition and gain monopoly power in another service market. The district court dismissed Viamedia's case, in part on the pleadings and in part on summary judgment. We reverse. Viamedia's allegations and evidence are sufficient to state and support claims that should be presented to a jury.

Because the district court dismissed part of the case on the pleadings and the rest on summary judgment, we must treat as true Viamedia's factual allegations and give it the benefit of factual disputes and favorable inferences from the evidence. To make sense of this case, we explain some basic business arrangements in the markets that put television programming in American homes, as well as market definitions necessary in evaluating the antitrust claims.

The parties agree on the definitions of the relevant geographic and service markets. Viamedia asserts claims against Comcast for monopolization in three geographic markets: the Chicago, Detroit, and Hartford metropolitan areas. In each of those three geographic markets Comcast now has monopoly power over two separate service markets: Interconnect services and advertising representation services. Interconnect services are cooperative selling arrangements for advertising through an "Interconnect" that enables providers of retail cable television services to sell advertising targeted efficiently at regional audiences. Advertising representation services for retail cable television providers assist those providers with the sale and delivery of national, regional, and local advertising slots. This market in advertising representation services is

the one in which Viamedia competed with Comcast. In each geographic market, according to Viamedia's evidence, Comcast used its monopoly power over the cooperative Interconnects to force its smaller retail cable television competitors to stop doing business with Viamedia, thereby gaining monopoly power over the market for advertising representation services.

Viamedia has presented evidence that Comcast's elimination of its only competitor in the advertising representation services market has harmed competition in violation of Section 2. According to Viamedia's evidence, its customers for advertising representation services (i.e., Comcast's retail cable competitors) did not switch to Comcast because it offered a better-quality or lower-priced service. They switched because Comcast used its monopoly power over the Interconnects to present its cable competitors with a Hobson's choice: either start buying advertising representation services from us and regain access to the Interconnects, or keep buying those services from Viamedia and stay cut off from the Interconnects they needed to compete effectively. According to Viamedia's evidence, Comcast deliberately adopted a strategy it knew would cost Comcast itself millions of dollars in the short run, but the strategy eventually gave it monopoly power in these local markets for advertising representation services. Giving Viamedia the benefit of its allegations and evidence, this is not a case in which Section 2 is being misused to protect weaker competitors rather than competition more generally. See *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 906 (2007), quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (purpose of the antitrust laws is to protect "*competition,* not *competitors*").

As now the sole provider of advertising representation services to its cable competitors, Comcast can also damage competition beyond the relatively narrow markets for advertising representation services in Chicago, Detroit, and Hartford. This control allows it to undercut competition in two more markets: cable television services to retail customers, and the sale of advertising spots to local retailers. By establishing itself as the gatekeeper for its cable competitors' advertising, Comcast has gained access to their sensitive marketing and promotional pricing information. And because Comcast took control of its rival cable companies' inventory of local ads, local retailers no longer have a choice of cable companies from whom they buy ad time.[1]

Viamedia has thus offered evidence to defeat summary judgment on its claim that Comcast unlawfully used its monopoly power over the Interconnects to tie those services to its advertising representation services. Viamedia has also adequately stated a claim that Comcast has unlawfully refused to deal with Viamedia and any cable competitor that bought advertising representation services from Viamedia. On the pleadings and the summary judgment record, Viamedia's *prima facie* claims of monopolization are similar to but stronger than the successful plaintiff's Section 2 claim in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585

---

[1] Comcast sells advertising representation services through an entity called Comcast Cable Communications Management, LLC, which was formerly called Comcast Spotlight. The district court and the parties have referred to Comcast's ad-related services division as both Comcast and Comcast Spotlight. We use "Comcast" to refer to both together but make clear when we refer to Comcast Spotlight in particular.

(1985). We remand this case for any further necessary discovery and for trial.

In Part I, we lay out the key facts: in Part I-A, the structure of the cable television markets; in Part I-B, the specifics of Comcast's and Viamedia's businesses, including the advertising representation services they both offer and the critical role that Interconnects play for providers of cable television programming; and in Part I-C, Comcast's refusal to continue providing Interconnect access to Viamedia or any of its customers in Chicago, Detroit, and Hartford. In Part II, we review the district court proceedings. Then, in Part III-A, we lay out the legal standards under Section 2 that apply to Viamedia's claims. In Part III-B-1, we apply that law to Comcast's decision to refuse to allow Viamedia or its customers access to the Interconnects. In Part III-B-2, we apply that law to Viamedia's claim that Comcast illegally tied Interconnect services to advertising representation services. In Part III-C, we evaluate in greater detail the harm to competition alleged by Viamedia and the procompetitive justifications offered by Comcast, highlighting considerations that will be relevant on remand. Finally, in Parts III-D and III-E, we address issues of antitrust injury and the district court's exclusion of expert witnesses.

I.   *The Markets and the Competitors*

Because the district court dismissed one claim on the pleadings and the other on summary judgment, we present the relevant allegations and evidence in the light reasonably most favorable to plaintiff Viamedia, the non-moving party. The parties agree on the definition of the relevant geographic markets, and the relevant service-product markets are not disputed on appeal. The relevant geographic markets are the Chicago, Detroit, and Hartford metropolitan areas, called

Direct Marketing Areas or DMAs. The monopolized service market in each metropolitan area is that for the sale of advertising representation services ("ad rep services" in industry terms) related to so-called spot advertising on cable systems. To assess the harm to competition that can result from monopolization of the market for ad rep services, we must explain the related markets for retail cable television services to consumers, as well as access to the cable companies' cooperative advertising distribution platforms called Interconnects.

A. *Cable Television: History, Revenue Sources, and Competition*

Understanding these markets' competitive dynamics requires a bit of history about the evolution of television in the United States, including the challenges that cable companies have faced in competing with over-the-air broadcast programming.

1. *Television Programming and Advertising*

An awkward acronym, MVPDs, stands for "multichannel video programming distributors." That umbrella term includes cable companies like Comcast and Cox, as well as "overbuilders" like RCN and Wide Open West, known as WOW!. Beyond cable companies, MVPDs also include direct-broadcast satellite companies (AT&T's DirecTV and Dish Network), as well as companies formerly associated only with telephone service (e.g., Verizon's FiOS and AT&T's U-verse). The

two largest MVPDs are Comcast and AT&T-DirecTV, which together have more than 20 million television subscribers.[2]

Focusing on the advertising-supported network programming carried by these MVPDs, we explain the special obstacles cable companies face in taking advantage of advertising revenue. The cable companies' solution—jointly developing the Interconnects—created a later opening for a dominant cable company like Comcast to use its power over several Interconnects to gain a monopoly in a related market and to gain some measure of oversight and control of its smaller cable competitors.

For decades, television programming was dominated by three broadcast networks and was funded largely by the advertisements that ran in the programming. To help advertisers know how many and which viewers they were reaching, the industry adopted various audience measurement metrics, most importantly "Designated Market Areas" or "DMAs." DMAs are meant to capture regional audiences that are likely to view the same programming. They often encompass more than a single county and can also cross state lines.

As cable television companies got started, they typically won exclusive franchise areas granted by local governments. Their further expansion was then "subsidized by monopoly profits" from these exclusive territories. U.S. Dep't of Justice, *Voice, Video and Broadband: The Changing Competitive Landscape and Its Impact on Consumers* 71 (Nov. 2008) (DOJ Report). Cable companies then grew and consolidated by sewing

---

[2] For statutory definitions of "multichannel video programming distributor" (MVPD), "cable service," and "video programming," see 47 U.S.C. § 522(13), (6), and (20).

together such local franchises. Critically for this case, the patchwork combinations of local franchise areas did not align with DMAs.

2.  *Revenue Sources: Competition and Cooperation*

Most revenue for MVPDs comes from (1) the sale of advertising and (2) customer subscription fees. In geographic areas where MVPDs overlap, they compete on both fronts. The conduct at issue in this litigation affects both fronts and millions of households in the key metropolitan areas, and it potentially affects tens of millions more in other metropolitan areas.

a.  *Competition for Advertising Dollars and Cooperation Through Interconnects*

The mechanics of advertising are central to this lawsuit, accounting for the existence of the market in which Comcast and Viamedia competed. For every hour of programming, networks allot a certain number of minutes for advertisements. Contracts between an MVPD and a network (e.g., CNN or ESPN) typically make two or three of those minutes per hour available for the MVPDs to sell themselves, with the networks selling the remainder. MVPDs can sell these time slots to advertisers in various increments of time, such as 15, 30, or 60 seconds. Each increment is typically referred to as a "spot cable availability," or "spot avail." Approximately 75% of the spot avails are sold to advertisers. The MVPDs use the remaining 25% to advertise their own products and services.

This brings us to the source of the problem here. In the early days of cable, advertisers who wanted to reach an entire DMA such as Chicago faced an obstacle. Cable systems had grown organically, with each cable service obtaining franchises "through the simple addition of new systems as

opportunities arose," leaving cable "company holdings … typically scattered across the country." Patrick R. Parsons, *Horizontal Integration in the Cable Television Industry: History and Context*, 16 The Journal of Media Economics, no. 1 (2003) at 23, 37. Most important, the DMAs that helped broadcast television advertising reach entire marketing areas did not align with cable companies' franchise areas. And yet, for a substantial percentage of spot avails, it would be most profitable to sell them on a regional, DMA-wide level.

As a result, cable companies had a weaker competitive position for advertising dollars vis-à-vis the broadcast networks and satellite providers, who could easily deliver advertising to an entire DMA. Cable companies could not offer DMA-wide coverage, so advertisers would pay less for spot avails. To ensure DMA-wide coverage, an advertiser had to contract separately with each cable provider whose footprint included any part of that DMA. This was inefficient.

The cable companies came up with a solution. They banded together to create a platform called an Interconnect that could bring together all cable providers within a given DMA. The cable companies could contribute their DMA-wide spot avails to the Interconnect, which would provide a single point of contact for advertisers. An advertiser could then purchase a particular time slot and be assured that its advertisement would appear in cable subscribers' programming throughout the DMA. Thus, Interconnect services are provided DMA by DMA. As described by Comcast, "interconnects were formed voluntarily by MVPDs in markets to pool their resources and offer DMA-wide selling of cable/MVPD advertising inventory[.] … Otherwise, advertisers trying to

cobble together a wide-footprint, MVPD-based advertising campaign would have to go MVPD-by-MVPD."

To cable subscribers, the national, regional, and local advertisements appear seamlessly within television shows and live sports events. But the hidden seam of the Interconnects—and the ways its spot avails are paid for and delivered—is the locus of Comcast's allegedly anticompetitive conduct.

For purposes of this suit, the services provided by the Interconnects must be distinguished from advertising representation services. An Interconnect operator will:

- Pool inventory of spot avails from multiple MVPDs on a DMA-wide basis;

- Employ sales personnel to sell and/or coordinate sales of DMA-wide spot avails;

- Distribute schedules of participating MVPDs' spot avails to facilitate coordinated merging of local advertising schedules;

- Coordinate insertion of ads (although MVPDs themselves generally provide the technical equipment for ad insertion into programming); and

- Collect money from Interconnect advertisers and coordinate payment to participating MVPDs or their ad representatives.

Thus, the Interconnects allow the participating MVPDs to sell their DMA-wide advertising in a way that mimics the

broadcast networks' and satellite providers' comprehensive coverage of a DMA.[3]

All participating MVPDs were intended to benefit from the Interconnects, and all were encouraged to participate to maximize the value of the DMA-wide spot avails. To quote Comcast again: "The value of an interconnect increases as more MVPDs in an area participate, so our incentive is to have as many MVPDs participate as possible." First Am. Cplt. ¶ 39. Because MVPDs will contribute only about one-third of their spot avails to the Interconnects, and compete with one another for local ad sales, Interconnect participants took steps to avoid giving preferential treatment to any single MVPD participant. To ensure fair administration of the Interconnects, they were initially conceived as being operated by non-MVPD, neutral third parties. At the time of their formation, Interconnects were overseen by boards of directors elected by all MVPD members.

Interconnects thus became valuable bridges to advertisers, translating into millions of dollars of advertising revenue each year in each market. Interconnects are especially valuable to smaller MVPDs. Once an Interconnect gains a critical mass of subscribers, regional or national advertisers are less likely to bother dealing with standalone MVPDs, especially those with small shares of DMA subscribers. And selling spot avails only to local (as opposed to DMA-wide or national) advertisers will not compensate for the lost revenue if an MVPD

---

[3] This type of cooperative arrangement is also available at the national level, with National Cable Communications (NCC) able to place ads across multiple DMAs or nationwide, replicating broadcast networks' and satellite providers' nationwide coverage. As the country's largest cable provider, Comcast now controls 60% of the NCC.

is shut out of the Interconnect. Purely local spot avails are sources of revenue and local business relationships, but they have lower profit margins.

An Interconnect is what economists call a "two-sided plat-form." It serves as a clearinghouse, offering "different prod-ucts or services to two different groups who both depend on the platform to intermediate between them." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2280 (2018). Such connectivity gives an Interconnect its value but can also be misused to harm competition.

On one side of the Interconnect are the advertisers, who are interested in reaching the greatest number of viewers, es-pecially within a targeted DMA. The more subscribers an MVPD can bring to the table, the more advertisers will pay to reach that expanded audience. On the other side of the Inter-connect are the MVPDs and their retail customers. The more advertisers that participate, the more valuable the Intercon-nect is to the MVPDs and their customers. Cable customers watching a ballgame or their favorite comedy may not think about the value of the advertisements they see, but MVPDs can use advertising revenue to keep monthly subscription prices lower and to run promotional discounts to bring in even more subscribers. Those new subscribers will in turn make the MVPD a more valuable and attractive advertising venue. The Interconnect can thus produce a competitively vir-tuous feedback loop. "[T]he value of the services that [an In-terconnect] provides increases as the number of participants on both sides of the [Interconnect] increases." See *American Express*, 138 S. Ct. at 2280–81. Or, as Comcast puts it: "The value of an interconnect increases as more MVPDs in an area

participate, so our incentive is to have as many MVPDs par-
ticipate as possible."

An Interconnect is not necessarily, however, a one-way
ratchet to increased demand. Decreased participation on ei-
ther side of the Interconnect can also reduce its value. Thus,
adapting language from *American Express*, an Interconnect
"losing participation on [the cable provider side] decreases
the value" of the advertiser side, and if advertisers "leave due
to this loss in value, then the [Interconnect] has even less value
to [the cable providers]—risking a feedback loop of declining
demand." 138 S. Ct. at 2281.

Whether the Interconnects are procompetitive or not de-
pends on the competitive dynamics among its participants. In
a competitive market, for example, the risk of negative feed-
back may serve as a check on the ability of any one participant
to raise prices or otherwise exert market power. See 138 S. Ct.
at 2281 n.1. Conversely, in a less competitive market, access to
the crucial Interconnects can be used to exclude competitors
and harm competition. The Interconnects are so important
that exclusionary conduct can become a weapon to injure
competitors.[4]

  b.  *Competition for Subscribers*

We have just outlined the ways in which MVPDs compete
and cooperate in the pursuit of advertising revenue, which is

---

[4] There is no challenge here to the legality of the Interconnects them-
selves, at least as originally conceived, which seem to fit the model of cer-
tain procompetitive cooperative arrangements among competitors. See
generally *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441
U.S. 1 (1979). Whether that remains the case when one MVPD controls an
Interconnect is a question not presented here.

the focus of Viamedia's claims. Yet to see the full potential harm to competition caused by Comcast's alleged conduct, we must also describe the MVPDs' competition for subscribers. Comcast's alleged conduct is all the more dangerous to competition because it was made possible by accelerating industry consolidation and has the potential to interfere with MVPDs' competition with one another. The industry dynamics provide important context to understand the exclusion of Viamedia from a handful of DMA Interconnects, at least initially, and the broader potential impact on MVPD markets in general.

i.   *Growing MVPD Competition*

Until the mid-1990s, cable companies typically operated as monopolists with exclusive local cable franchises in their respective areas. They showed little interest in building into one another's franchise areas and forcing competition. A combination of legal, regulatory, and practical barriers limited competitive entry by new MVPDs, and those limits were often supported by incumbent cable providers. DOJ Report at 32. Thus, only satellite companies DirecTV and Dish Network, with their nationwide coverage, could compete with cable companies for subscribers. Satellite companies were able to take some market share, particularly in rural areas, but their competitive threat to cable companies proved to be limited. DOJ Report at 5, 10, 22 & n.88, 59.

The 1990s saw major changes in the MVPD landscape. The cable industry shifted "toward regional consolidation, with specific companies carving out large parts of the country within which to group their systems." Patrick R. Parsons, *Horizontal Integration in the Cable Television Industry: History and Context*, 16 Journal of Media Economics, no. 1 (2003) at 23, 37.

The larger companies "bought and traded individual systems," with "the various systems in a given city" increasingly "fall[ing] into the hands of a single cable company." *Id.*

With changes in technology and the regulatory environment, however, cable companies were about to face new competitors. The Telecommunications Act of 1996 was intended to break down barriers among cable, telephone, satellite, and internet businesses to galvanize competition—and it did. Larry Satkowiak, *The Cable Industry: A Short History Through Three Generations* 47–48 (The Cable Center 2015). The lines between MVPDs, traditional telephone companies, and new broadband internet service providers became increasingly blurred as these companies started offering multiple services to consumers. DOJ Report at 1, 17, 19. Cable companies introduced telephone voice services, which had previously been a legal monopoly in many states, and started selling bundles of telephone, video, and broadband Internet access. *Id.* at 9, 11. Meanwhile, broadband internet service providers like RCN and WOW!, known as "overbuilders," built their own infrastructure in areas already served by incumbent cable companies and rolled out multiple services. *Id.* at 8 & n.33, 21 & n.78, 47.[5] And traditional telephone service providers responded in

---

[5] "The term 'overbuild' describes the situation in which a second cable operator enters a local market in direct competition with an incumbent cable operator. In these markets, the second operator, or 'overbuilder,' lays wires in the same area as the incumbent, 'overbuilding' the incumbent's plant, thereby giving consumers a choice between cable service providers." Report and Order and Further Notice of Proposed Rulemaking at 15 n.97, *In the Matter of Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992*, FCC MB Docket 05-311 (Mar. 5, 2007) (FCC 2007 Report and Order).

kind. Verizon introduced its FiOS service in 2005, and AT&T followed with its MVPD service dubbed "U-Verse." *Id.* at 6–7.

Thus, cable providers—formerly the beneficiaries of cable franchise monopolies—suddenly faced a new array of competitors. Today, many DMAs are served by an incumbent cable provider (e.g., Comcast), one or more overbuilder cable providers (e.g., RCN and WOW!), one or more telephone companies offering video services (e.g., Verizon FIOS), and two satellite dish providers (DISH and AT&T-DirecTV).

> ii. *Incumbent Cable Companies' Efforts to Stymie Competition for Subscribers*

This new competition led to credible reports of lower prices and falling cable subscription rates in areas with new MVPD entrants—exactly what one would hope to see in competitive markets. DOJ Report at 38–39 & nn.180–83. Incumbent cable companies were forced to "respond[] to new entry by improving customer service, increasing bandwidth speeds …, adding more programming channels and services, and rolling out enhanced products (such as HD)." *Id.* at 48; see also *id.* at 45–46. But new MVPD competitors continued to encounter obstacles, including some put in place by the incumbent cable providers. The incumbents had strong incentives to try to stymie these new competitors. As the FCC noted, competition from new cable companies reduces rates far more than competition from satellite companies. FCC 2007 Report and Order at 26 ¶ 50.

Among the obstacles for new competitors relevant to this case, incumbent cable providers entered into exclusive contracts with apartment buildings dense with potential subscribers, which new entrants could not reach, and exclusive

and discriminatory contracts with programmers, whose content new entrants could not carry. FCC 2007 Report and Order at 18 ¶ 35. Overbuilders and the FCC reported in 2008 that "[e]xclusivity and discrimination in access to programming are the most powerful tactics that incumbent operators use in an effort to block or otherwise constrain [new] competition." DOJ Report at 74; see also *id.* at 73, 75, 89; Petition of RCN Telecom Services, Inc., to Deny Applications or Condition Consent at 24, 27, *In the Matter of Applications for Consent to the Transfer of Control of Licenses of Comcast Corporation and AT&T Corporation to AT&T Comcast Corp.*, FCC MB Docket 02-70 (Apr. 29, 2002) (RCN 2002 FCC Petition) (RCN recounting "the difficulties it has encountered in gaining, and keeping, access to critical, non-substitutable local programming controlled by Comcast" and the "numerous instances in which the incumbents (Comcast and its predecessors) have received exclusive building rights covering a period of years").

Incumbent providers also created barriers to signing up individual customers by locking existing subscribers into long-term contracts. Because of these long-term contracts "there is only a small window when a customer is able to move." DOJ Report at 52. "The incumbent [cable provider] knows when that window is, but the new entrant does not." *Id.* "The new entrant must spend resources marketing to customers during periods when they cannot switch or will have disincentives to doing so," while "an incumbent can target discounts and other incentives to subscribers immediately prior to the expiration of their contracts." *Id.* at 52–53. This competitive dynamic helps explain why smaller cable companies would hesitate to turn over their promotional advertising plans to their dominant cable competitor in advance of the

actual promotions—which is the likely result of Comcast's actions challenged in this case.

B. *The Ad Rep Services Market*

1. *The Role of Viamedia*

As MVPDs were trying to establish themselves in new markets, the sale of spot avails provided a key source of revenue that helped subsidize offers to attract subscribers. Incumbent cable companies had been selling their spot avails to advertisers for decades, with the scale, internal structures, and sales and operational personnel to support those activities. The new overbuilders and telephone service providers had no such experience or infrastructure.

Enter Viamedia. The new MVPD competitors could have all spent money to hire their own advertising sales staffs, to buy and implement billing systems, to set up monitoring protocols, and to deal with the necessary equipment to insert those ads seamlessly and accurately into programming. Many, including MVPDs in Chicago, Detroit, and Hartford, chose instead to contract for these spot advertising services with Viamedia. RCN, for example, could focus on competing with incumbent MVPDs through attracting subscribers and building out its footprint, with an assured ad revenue stream managed by Viamedia. With an Interconnect already in place, the new MVPDs (or Viamedia on their behalf) could sign an agreement with that Interconnect so that advertisers could place DMA-wide ads that reached the new entrants' subscribers along with the those of the incumbents.

These ad rep services are at the core of this lawsuit. The ad rep services that Viamedia provides its customer MVPDs include:

- Allocating the MVPD's inventory of spot avails among different sales channels—i.e., local ads, sold in competition with other MVPDs; DMA-wide ads; or multi-DMA/national ads;

- Researching, marketing, pricing, and selling an MVPD's inventory of spot avails to advertisers, including the approximately one-third of spot avails sold to local retailers in competition with other MVPDs;

- Interfacing with the relevant Interconnect for spot avails allocated to regional, DMA-wide ads;

- Providing technical services such as encoding video files and operating and maintaining the software needed to run, insert, traffic, monitor, and archive ads;

- Organizing the MVPD's inventory of spot avails into schedules and ensuring that each ad runs correctly during those schedules; and

- Performing financial services, such as accounting, billing, and collection.

Viamedia employs the personnel needed for these functions, spreading these costs among all of its MVPD customers. If an MVPD retained Viamedia to provide this full range of services for all of its inventory of spot avails, including the competitive selling of local spot avails, it was said that the MVPD had secured "full turnkey" representation. As overbuilders and telephone companies continued their build out, Viamedia was able to expand the areas and MVPD customers to which it could supply services.

2. *Vertically Integrated MVPDs*

By contrast, Comcast does not need an independent ad rep services provider like Viamedia. Instead, Comcast is vertically integrated and has its own wholly-owned subsidiary that provides ad rep services both in-house and to other competing MVPDs. In markets where Comcast does not operate the Interconnects, its in-house ad rep services arm secures Interconnect access for its own MVPD service and its customer/competitors' MVPD services, just as Viamedia used to do in Chicago, Detroit, and Hartford. Several other MVPDs have similar internal divisions that provide spot cable ad rep services.[6] In fact, Viamedia is unique in that it is the only ad rep services firm of any size that is independent—i.e., not owned by an MVPD.

MVPDs that have their own ad rep services divisions or subsidiaries, such as Comcast, compete with Viamedia to provide these services to other MVPDs. And just as MVPDs compete for subscribers wherever their service footprints overlap, the providers of ad rep services compete DMA by DMA. The ad rep services providers organize their sales forces around the boundaries of DMAs and provide services only to the MVPDs who have subscribers within those DMAs. Hybrid arrangements also exist. Some MVPDs do not contract for "full turnkey services," but instead seek ad rep services for only a portion of their spot avails and sell the remaining spot avails themselves.

---

[6] These include Charter's Spectrum Reach, Cox's Cox Media, Altice's Suddenlink Media and Altice Media Solutions, and Mediacom's OnMedia.

This unusual market structure thus involves three levels of competition: (1) MVPDs compete against one another for subscribers; (2) some vertically integrated MVPDs' ad rep services arms compete against Viamedia (and potentially against each other) for clients; and (3) MVPDs compete with one another for some sales of their spot avails to advertisers. We need to keep all three levels in mind.

3. *Back to the Interconnects*

As part of the continuing industry consolidation in the 2000s, Comcast moved into many new DMAs. It also expanded from being one of several cable companies that participated in some DMA Interconnects to being the largest participant. For example, Comcast was able to acquire over 3,300 local cable franchising areas through its purchase of AT&T Broadband's and Adelphia's cable properties. FCC 2007 Report and Order at 15 & n.95. As Comcast repeatedly acquired other cable systems, it grew to be the largest participant in dozens of DMAs and became the sole "operator" or "manager" of those DMAs' Interconnects, including in Chicago, Detroit, and Hartford.

Yet the Interconnects continued to function as they had before industry consolidation. They provided a single point of contact for distributing DMA-wide ads, as well as access to and collecting fees from all MVPDs (or their ad rep service providers) that participated in the Interconnects. If an MVPD did not participate in an Interconnect, an advertiser could not reach its subscribers, making an ad buy within the DMA less valuable for any remaining MVPD Interconnect participants.

During this period, in 2003, Viamedia entered into agreements with Comcast for Interconnect access in the Chicago

and Detroit DMAs, which ran until May 2012. Viamedia sought this access because it provided ad rep services to cable overbuilders RCN (in Chicago) and WOW! (in Chicago and Detroit) under contracts that ran until 2014. As noted above, typical industry practice is for approximately one-third of an MVPD's spot avail inventory to be sold on a DMA-wide basis. In line with that practice, Viamedia agreed to sell a portion of RCN's and WOW!'s spot avail inventory on a DMA-wide basis through the Comcast-controlled Interconnects. Viamedia sold the remaining portion of RCN's and WOW!'s spot avails both nationally and—in competition with Comcast—locally. Comcast also agreed not to solicit Viamedia's MVPD clients until four months before the Viamedia/MVPD contracts expired, although the MVPDs remained free to contact Comcast.

C. *Comcast Refuses Interconnect Access to Viamedia*

This was the competitive landscape for Comcast's conduct challenged in this lawsuit. Internal Comcast PowerPoint presentations explained that Comcast viewed its "Next phase" as "consolidat[ing the] core business" of ad rep services, and then "look[ing] at other businesses we can leverage (our technologies or platforms)." A212 n.68. There is evidence that Comcast saw the Interconnects as one such point of "leverage."

As noted, Viamedia's Interconnect access agreements with Comcast for the Chicago and Detroit DMAs were due to expire in 2012. Viamedia's contracts for ad rep services with RCN and WOW! were extended until 2015 (RCN) and 2014 (WOW!). As 2012 neared, Comcast faced a choice. It could compete for RCN's and WOW!'s ad rep services business the following year, as it already competed for RCN's, WOW!'s, and other MVPDs' business in many other DMAs. Or it could

try to use its control over the Interconnects to shut out the competition for ad rep services. At first, it appeared that Comcast would take the route of competition, contacting RCN and WOW! to express interest in selling them ad rep services. But Comcast then changed its strategy. It tried instead to take advantage of its control over the Interconnects. Comcast notified Viamedia in December 2011 that it would refuse to permit Viamedia any further access to the Interconnects. In June 2012 Comcast executed on that notice. For the first time in any DMA since the Interconnects had been created, an Interconnect operator—Comcast—had cut off Interconnect access to an MVPD or an MVPD representative.

Comcast executed this strategy in other DMAs, as well, similarly denying Viamedia access to Interconnects on behalf of Viamedia's customer MVPDs (Comcast's competitor MVPDs). For example, in the Hartford DMA, Comcast had previously provided full-turnkey service to AT&T's MVPD. When Frontier acquired AT&T's Hartford network in 2014, it had the option of assuming the Comcast contract. Frontier, however, had been unhappy with Comcast's customer service when it used Comcast in other DMAs, so it switched from Comcast to Viamedia. Comcast then excluded Frontier's spot avails from the Hartford Interconnect, resulting in millions of dollars in lost ad revenues for Frontier and Viamedia, as well as Comcast itself, and degrading the value of the Hartford Interconnect.[7] By contrast, in DMAs where the Interconnects

---

[7] On these points, the record contains more precise numbers in documents that have been under seal. Here and elsewhere in this opinion, we have used verbal descriptions rather than specific numbers for important information that has been submitted under seal. We are skeptical, however, about the grounds for sealing much, if not all, of the evidence under seal. Simultaneously with this decision, we are issuing an order that

were controlled not by Comcast but by other large, incumbent cable companies such as TimeWarner Cable, access to the Interconnects had not yet been pulled.

Comcast then returned to Viamedia with a series of offers that would have required Viamedia to "assign" 100% of its customers' spot avails to Comcast in exchange for a one-time "finder's fee." That was essentially an offer to pay Viamedia to exit the marketplace. At the end of July 2014, Comcast provided a more detailed offer. It would have had the same effect as the first offer—a payment to Viamedia to stop providing spot cable ad rep services. In August 2014, Viamedia received the third iteration of Comcast's offer, which at first appeared promising. When Viamedia received a detailed offer in writing, however, it discovered that Comcast had added a provision that would permit Comcast unilaterally, and on just four hours' notice, to take any ad inventory from Viamedia and contribute it to the Interconnect. That uncertainty would have rendered those spot avails virtually worthless to advertisers.

Along with these onerous terms, the revenue-share proposals appeared to be below market rate for Interconnect-only access, compared to both Viamedia's prior agreement with Comcast and other Interconnect-only access agreements in any other comparable DMAs. In short, the agreements did not offer access to the Interconnect in a way that would allow Viamedia to provide ad rep services to its MVPD customers. Nor were these terms to be found in any other Interconnect-

---

unseals evidence we identified in an earlier order to show cause, and we are ordering the parties to show cause why any of the remaining sealed evidence, including that obtained from non-parties, should remain under seal at this time.

only agreement employed by any Interconnect operator in any DMA.

Moreover, during these "negotiations" in July 2014, the head of Comcast's cable spot ad rep services division and his colleague, Hank Oster, expressed concern that Comcast COO Dave Watson was "wavering on why we won't let Viamedia in the Interconnects." Whatever second thoughts some within Comcast might have had, however, Comcast's approach did not change. As Oster later candidly explained, by July 2014 Comcast already "had made the decision" to exclude Viamedia from the Interconnects. Comcast was also telling WOW! that it would not allow it to return to the Interconnect with Viamedia as its ad rep, and that Comcast was taking that position as part of its "strategic plan." A230.

Comcast urges us to infer—as a matter of law—that it was acting for procompetitive reasons. The evidence, though, can easily support the inference that Comcast was instead choosing to inflict financial pain on both its competitors *and itself* to gain monopoly power in the ad rep services market, which would also produce a new advantage over its retail cable competitors. By cutting Viamedia off from the Chicago and Detroit Interconnects in 2012, Comcast ensured that its competitor MVPDs' spot avails could not be distributed through the Interconnects while they were represented by Viamedia under their existing contracts.

This was an expensive decision for Comcast. As operator of the Interconnect, Comcast's internal analysis of the "Revenue Impact" of its decision predicted that Comcast itself would lose $10.6 million in just the first six months after cutting off Viamedia's (and thus RCN's and WOW!'s) access, including $2.3 million in lost cash flow. A838, A787–88. The

evidence of actual effects is consistent with that prediction. In the years that RCN and WOW! were unable to access the Interconnects (June 2012 through December 2015), they lost approximately $27 million in ad revenue. Comcast itself lost $7 million in commissions. A248, A637, A648 (figs. 35, 46). Moreover, Comcast's own spot avails would have decreased in value because an advertiser could no longer reach all cable subscribers within the DMA through the Interconnect.

But as an amicus supporting Comcast points out, Comcast could easily afford to sacrifice millions in Interconnect fees and lower ad revenue in order to inflict this harm on its MVPD competitors, advertisers, and Viamedia. As the dominant MVPD provider in markets across the country, this "temporary and localized lost revenue is small potatoes," a mere "rounding error." Brief for Washington Legal Foundation's as Amicus Curiae Supporting Appellees at 22. Just so.

With Comcast and Viamedia as the only two providers of ad rep services in the Chicago and Detroit DMAs, Comcast's denial of Interconnect access to Viamedia left Comcast with an effective monopoly over both Interconnect services *and* ad rep services. The window of time between Viamedia's foreclosure from Interconnect access and Comcast's competitor MVPDs' return to the market to seek bids for their ad rep services would be the time for Comcast "to overpower ViaMedia," as a Comcast employee in the Detroit DMA explained. A217 (budget presentation). So the evidence supports an inference that Comcast willingly chose to inflict short-term financial losses on itself. Why? A reasonable explanation is that it did so because it could survive those losses (the "small potatoes" and "rounding error") to obtain and use monopoly power in the ad rep services market.

In this lawsuit Comcast has argued that RCN and WOW! chose it over Viamedia on the merits of its offered services. Comcast highlights, for example, testimony from an RCN representative that—after comparing Comcast's offer with Interconnect access to Viamedia's offer without—"It was not in the end a very difficult decision to make." DA688. But this answer presupposes that Comcast shutting its competitors out of the Interconnects could be a reasonable basis to treat RCN's decision as uncoerced. There is evidence that Comcast did just that. Contrary to the assertions of the district court and our colleague who dissents in part, for example, a Comcast employee working in the Chicago and Detroit DMAs explained that Comcast had adopted "a business practice" that "if an MVPD wants to get access to a Comcast controlled Interconnect, it has to hire Comcast as its sale representative." A215.

Viamedia's evidence also supports a finding that WOW! and RCN did not go willingly into Comcast's arms. Both pushed back against Comcast's demands (or threats) that they either use it for their advertising services or face exclusion from the Interconnects if they stayed with Viamedia. A WOW! employee communicating with Comcast reported back to WOW! colleagues that Comcast was "maintaining their position that [WOW!] can be in the IC [Interconnect] but only if they [Comcast] rep us directly." A215 n.81, A230 n.129. It is a factual question whether it was reasonable at the time for the smaller MVPDs to "understand [that] to be part of the interconnect [they] would need to be with Comcast Spotlight," Comcast's ad rep services arm. DA687.

Comcast's competitor MVPDs immediately began losing money after Comcast excluded them from the Interconnects. They lamented that their reductions in cash flow were

"primarily due to the loss of the Comcast Interconnect revenues in Chicago and Detroit." A233. Despite that pressure, though, the MVPDs continued to resist Comcast's demands. As discussed above, at the time, Comcast was trying to buy TimeWarner Cable, a proposed deal that was under review by federal agencies. With a forum to share their ongoing experiences with Comcast, RCN (futilely) filed comments with the FCC, alerting regulators that "Comcast was not being truthful" when it said "RCN is free to join the Comcast-managed interconnects at any time," because "Comcast will only allow RCN to join the interconnects if RCN employs Comcast Spotlight instead of Viamedia." A215 n.81, A886–87.

Viamedia also was not going quietly. Even though Comcast had barred it from Interconnect access, Viamedia continued to compete for RCN's and WOW!'s business. Without Interconnect access, their MVPD customers' spot avails would not bring in nearly as much revenue, which left Viamedia's bids' proposed revenue shares at a substantial disadvantage compared to Comcast's bids. A231–32. Nonetheless, Viamedia's bids caused consternation for Comcast. Internal Comcast emails reflect executives' disbelief. They called it "absolutely unbelievable" that Viamedia could make a remotely competitive bid without Interconnect access. A232. In contrast to Viamedia's bids, Comcast bids touted the "exclusive" benefit of Interconnect access that WOW! would receive if it selected Comcast for ad rep services. Comcast said that the "generous" financial terms it offered included the "sizable annual guarantee" that would be attributable to "the opportunity to add WOW! subscribers [back] to the important Detroit and Chicago Interconnects." In other words, sign up with Comcast for ad rep services, and we will stop your bleeding—

the bleeding that we have inflicted by barring you from the DMA Interconnects.

Substantial evidence thus shows that Comcast's MVPD competitors did not want to buy ad rep services from Comcast. Their reluctance was not based on a short-sighted inability to see the procompetitive benefits of Comcast's vertical integration or what Comcast touts as "one-stop shopping." Rather, these MVPDs had economically rational reasons for seeking to avoid this entanglement with their dominant competitor, which would naturally have divided loyalties. In addition, WOW! considered Viamedia to be "by far the best ad partner from a technical team to work with." A560, DA 685. RCN testified that it would prefer to obtain ad rep services from an independent company like Viamedia rather than Comcast because, "all things being equal, even close to being equal," it "had concerns about being a partner with a company associated with our competitor." A236 n.150.

Thus, as Comcast's MVPD competitors assessed the situation, the possible outcomes all amounted to unfair wins for Comcast. Its actions could have resulted in three different outcomes, each of which would work to its benefit and harm its competitors. First, if Comcast succeeded in having its competitor MVPDs buy Comcast ad rep services, Comcast would gain the following benefits:

- Comcast's smaller MVPD rivals would now be contributing additional revenue toward their dominant competitor, Comcast;

- The majority of spot avails that MVPDs had formerly kept out of the Interconnects to allocate to, among other outlets, local ads (for which the

MVPDs compete against each other for sales) would now come under the control of their competitor Comcast—whose contracts required that Comcast have "sole and exclusive control" over all spot avails;

- Comcast's competitor MVPDs would just have to trust that Comcast would make the best business decisions on behalf of its competitors when allocating adds to the national, regional, and local sales markets. For example, the smaller MVPDs prefer to weight some of their ad sales to non-Interconnect local sales, which help the MVPDs with local business relationships that can lead to additional sales of services, such as providing business internet connectivity (sales for which they compete against Comcast); the Interconnect operator, on the other hand, prefers DMA-wide Interconnect ad sales for which it gets higher margins—an ad mix choice that Comcast would be free to make for its smaller MVPD competitors;

- Comcast would be a single seller of advertisements in the local market, eliminating competition;

- Comcast would not only have access to its competitor MVPDs' ad sales information, but the MVPDs would have to provide Comcast with all of their own promotional ad materials to current and potential subscribers that they are attempting to retain or win away from Comcast, giving Comcast a chance to undercut them. That would be in addition to other competitively sensitive information

(e.g., number and location of its subscribers) that would need to be disclosed.

Viamedia has offered evidence that what drove Comcast's actions was this close relationship with competing MVPDs—not hypothesized economic efficiencies from ordinary vertical integration. For example, there are some DMAs where Comcast controls the Interconnects, but the participating MVPDs do not have overlapping footprints with Comcast's service areas. In those DMAs, Comcast still offers Interconnect-only agreements on terms similar to the terms of the former Comcast-Viamedia agreements for the Chicago and Detroit DMAs.

Viamedia offered evidence on summary judgment (described above) of a second outcome in which Comcast's MVPD competitors would forgo Interconnect access entirely and renew with Viamedia rather than switch to Comcast. If its MVPD competitors made that choice, those MVPDs would be cut off from a large percentage of ad revenue, which in turn would hinder them from funding promotional offers to their subscribers, potentially leading their subscribers to switch to Comcast. In the meantime, Comcast's lost millions from Interconnect fees and reduced advertising revenue within the DMA would continue to be a mere "rounding error."

In the third potential outcome—which only Comcast contends was actually a possibility—Comcast would not bar competing MVPDs completely from Interconnect access but instead would permit them to have Interconnect-only access if they took care of their own ad services, without using either Viamedia's or Comcast's ad rep services. In this scenario, Comcast would lose the revenue it would have gained from providing full-turnkey service to the MVPDs, but it would still earn Interconnect access fees and the Interconnect's value

would not be degraded. The result would also raise rivals' costs by forcing them to provide internally the staff, technology, and services that Viamedia had previously provided at lower cost. Those fixed costs would be difficult for those MVPDs to afford and would shift revenue away from subscriber promotions and further infrastructure build-out. See FCC 2007 Report and Order at 8 ¶ 13 ("Revenues from cable services are, in fact, a driver for broadband deployment," i.e., the build-out of additional cable infrastructure).[8]

Faced with this Hobson's choice, Comcast's competitor MVPDs chose to sign with Comcast in 2015. WOW! noted that "a key decision point" in this "choice" was its understanding that "in order to remain competitive, we need to be in the Interconnect." A233. WOW! signed with Comcast for ad rep services in Chicago and Detroit in 2015. WOW! continued, however, to use Viamedia as its ad rep in some non-Comcast DMAs. Similarly, although RCN had planned to renew its contract with Viamedia, it too ultimately decided to sign with Comcast for Chicago and Detroit. By 2016, a Comcast employee congratulated a colleague regarding its new monopoly in ad rep services in the Chicago DMA: "THE WOW AND RCN DEALS PROVIDE [COMCAST] WITH COMPLETE

---

[8] Viamedia has presented evidence that RCN and WOW! did not view bringing ad rep services in-house as a viable option. When confronted with Comcast's refusal to deal with Viamedia, both said they had no choice but to enter into ad rep agreements with Comcast. A215, A887. The in-house option was always available in theory. But RCN and WOW! are presumed to be economically rational actors. They had always chosen to buy these services from outside companies, suggesting that in-house was not an economically viable option.

REPRESENTATION OF THE CHICAGO MARKET." A214 n.77.

II. *District Court Proceedings*

In 2016, Viamedia sued Comcast for violating Section 2 of the Sherman Antitrust Act, as well as various state antitrust statutes, and for tortious interference. The parties agree that analysis under the state antitrust statutes tracks federal antitrust law, so the federal antitrust analysis controls whether the state antitrust claims survive. Viamedia is no longer pressing its tortious interference claim, so our only focus is Section 2 of the Sherman Act.

Comcast moved to dismiss the complaint for failing to state a claim. The district court construed Viamedia's complaint as alleging that Comcast engaged in three types of monopolistic conduct recognized by the antitrust laws: (1) Comcast's refusal to deal with Viamedia by cutting off access to the Interconnects, (2) Comcast's exclusive dealing, and (3) Comcast's tying of Interconnect access to the purchase of Comcast's ad rep services.

The district court granted the motion to dismiss with respect to Viamedia's refusal-to-deal claim, faulting Viamedia for failing to demonstrate through its allegations that Comcast's conduct was "irrational but for its anticompetitive effects." *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 698 (N.D. Ill. 2016). The court hypothesized that Comcast's complete foreclosure of Viamedia from the market potentially serves a procompetitive purpose and "offers potentially improved efficiency." 218 F. Supp. 3d at 699. And because "vertical integration is usually procompetitive," Comcast likely had "a rational procompetitive purpose: it has become 'a one-

stop shop' in certain DMAs for MVPDs wishing to sell adver-
tisements on a regional basis." *Id*. at 698–99. Comcast's "short-
term losses" in excluding Viamedia and Comcast's competi-
tor MVPDs from the Interconnects were not "necessarily in-
dicative of anticompetitive conduct," the court reasoned in
dismissing a later version of the complaint on identical
grounds, because a "monopolist might wish to withdraw
from a prior course of dealing … in order to pursue perfectly
competitive ends." *Viamedia, Inc. v. Comcast Corp.*, No. 16-CV-
5486, 2017 WL 698681, at *4 (N.D. Ill. Feb. 22, 2017), quoting
*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir.
2013).

After discovery on Viamedia's exclusive dealing and tying
claims, the district court granted Comcast's motion for sum-
mary judgment because Viamedia had failed to "present evi-
dence that tends to exclude the possibility that [defendant's]
conduct was as consistent with competition as with illegal
conduct." *Viamedia, Inc. v. Comcast Corp.*, 335 F. Supp. 3d 1036,
1054 (N.D. Ill. 2018). In the district court's view, there was no
evidence that Comcast conditioned its sale of Interconnect
services to MVPDs on their purchase of ad rep services be-
cause in DMAs outside the relevant geographic markets,
Comcast *did* offer Interconnect-only access to other MVPDs.
*Id*. at 1058–59. Further, because "both RCN and WOW! *wanted*
full-turnkey representation," the purchase of the two prod-
ucts together could not be considered tying. *Id*. at 1059. In fact,
the district court concluded (in tension with the observation
that Comcast offered Interconnect-only access in other
DMAs), Comcast had "no reason to offer" Interconnect-only
access to RCN and WOW! because, the district court again hy-
pothesized, an Interconnect-only deal would be less

substantial, less profitable, and less efficient for Comcast than a full-turnkey deal. *Id*. at 1059.

In any event, even if Comcast had refused to deal with its competitor MVPDs unless they met Comcast's condition of purchasing ad rep services, the court viewed this as simply a reformulation of Viamedia's already-dismissed refusal-to-deal claim. 335 F. Supp. 3d at 1062, 1070, 1072. To support this conclusion, the district court noted that Viamedia sought injunctive relief that would restore its access to the Interconnects and give RCN and WOW! the option to decline purchase of Comcast's ad rep services. *Id*. at 1074.

In addition, the district court found that Viamedia's two experts' testimony was based upon an incorrect understanding of the law—i.e., that Comcast had engaged in anticompetitive conduct for which it could be held responsible under the antitrust laws. *Id*. at 1064–74. The district court concluded that this justified excluding the damages expert's testimony in its entirety, as well as a portion of the economic expert's testimony. Viamedia has appealed the final judgment dismissing its claims.

III. *Legal Standards and Analysis*

With the facts and competitive dynamics set out, we turn to the legal standards and analysis. In Part III-A, we describe the standards for an antitrust violation under Section 2, the monopolization provision of the Sherman Act. Undisputed by the parties, we explain that Comcast is a monopolist in the relevant geographic markets (here: Chicago, Detroit, and Hartford) for both Interconnect and ad rep services, and that it is the dominant MVPD retail cable provider.

In Part III-B, we address Viamedia's two claims. In Part III-B-1, we set out the legal test for refusals to deal and assess Comcast's conduct, explaining why this claim should not have been dismissed on the pleadings. In Part III-B-2, we turn to Viamedia's tying claim. These related claims are both based on the same course of conduct, resulted in the same anticompetitive harms, and would be subject to the same procompetitive justifications or defenses. The decision to dismiss one claim on the pleadings while allowing the other, closely related claim to go as far as summary judgment offered potential for confusion, but in the end, both claims need to be tried.

In Part III-C, we evaluate in greater detail the harm to competition alleged by Viamedia and the procompetitive justifications offered by Comcast, highlighting considerations that will be relevant on remand. In Part III-D, we explain that Viamedia has presented evidence of a cognizable antitrust injury as a rival driven from the market by a tying arrangement.

Finally, in Part III-E, we address the district court's rulings excluding expert witness evidence. Our resolution of Viamedia's refusal-to-deal and tying claims largely resolves its challenge to the testimony's exclusion. The district court's decision on this score was based almost entirely upon its erroneous legal analysis. On remand, the district court will need to take a fresh look at the expert reports in light of this opinion.

A. *Sherman Act Section 2—Illegal Monopolization*

Section 2 of the Sherman Antitrust Act imposes liability on "Every person who shall monopolize … any part of the trade or commerce among the several States." 15 U.S.C. § 2. A private plaintiff like Viamedia may bring a civil claim as a person

who was "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).

Judicial decisions interpreting Section 2 have long held that simple possession of monopoly power, or the pursuit of it, is not in itself illegal. *United States v. U.S. Steel Corp.*, 251 U.S. 417, 451 (1920) ("[T]he law does not make mere size an offence, or the existence of unexerted power an offense. It … requires overt acts."); *United States v. Aluminum Co. of America*, 148 F.2d 416, 429–30 (2d Cir. 1945) ("size does not determine guilt" as the monopolist may have gained market power "by force of accident," or "by virtue of his superior skill, foresight and industry"; therefore, "there must be some 'exclusion' of competitors"). Thus, a firm violates the monopoly provision in Section 2 only when it both (1) possesses "monopoly power in the relevant market" *and* (2) engages in "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); see also Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 600a, at 3, ¶ 650a, at 91 (4th ed. 2015) (Areeda & Hovenkamp).[9]

On appeal, the parties do not dispute several often-contentious issues in antitrust cases: the relevant geographic and product markets, and market power. See *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("Few would

---

[9] This appeal does not present any issues under the Section 2 language barring attempts and conspiracies to monopolize.

say that the first element is easily proved: it is exceedingly difficult to prove market power, or monopoly power … ."). The relevant geographic markets are the specific DMAs in which Viamedia asserts Comcast's conduct harmed competition: Chicago, Detroit, and Hartford. See *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332–33 (1961) (a relevant antitrust geographic market is the area in which sellers operate and where purchasers can predictably turn for supplies). Comcast's conduct in other DMAs may be relevant for comparison purposes.

The relevant product market allegedly monopolized is ad rep services for MVPDs. The immediate effect of Comcast's conduct was to force out its only competitor in that market to gain monopoly power in the relevant geographic markets for those services. This market is inextricably connected to access to the cooperative mechanism of the Interconnects, as well as to the related markets for MVPD retail cable services and the sale of MVPD spot avails. Understanding the harm to competition in these related markets helps in assessing Comcast's alleged conduct. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Trinko*, 540 U.S. at 411; see also Areeda & Hovenkamp ¶ 1802d, at 79–80 (When assessing exclusionary conduct, it is "necessary to examine market power or share at *both* of the two market levels involved.").

As for market power, in the Chicago, Detroit, and Hartford markets, Comcast started with monopoly control over Interconnect access and services. Comcast has acquired a pure monopoly in the market for ad rep services in these

metropolitan areas, where it is also by far the dominant MVPD retail cable provider.[10]

A firm's market power is important because, without it, a firm will have little to no ability to distort or harm competition, no matter how great its desire to do so, even when engaging in conduct that in different circumstances might be perceived as anticompetitive. See *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (Gorsuch, J.) ("Not infrequently, the initial question of market power proves decisive."). Even "[m]ildly reprehensible behavior might be enough to challenge a firm whose power is significant." Areeda & Hovenkamp ¶ 600b, at 4.

B. *Claims of Anticompetitive Conduct: Refusals to Deal and Tying*

The dispute here focuses on the second prong of the Section 2 test: did Comcast "willfully acquire" or "maintain" its new monopoly power in the ad rep services market, or is its new market dominance "a consequence of a superior product or business acumen" or the result of an "historic accident"?

Baked into this inquiry is an assessment of what types of anticompetitive conduct are prohibited as illegally acquiring or maintaining monopoly power, rather than the kind of procompetitive conduct the antitrust laws do not impede. The latter includes innovation resulting in superior products, the introduction of efficiencies reflecting superior business acumen, or even the luck of a firm that unwittingly stumbles into a

---

[10] For antitrust purposes "monopoly power and market power typically are used interchangeably" and simply mean that "a firm can influence the price it receives for its product." Dennis W. Carlton and Jeffery M. Perloff, *Modern Industrial Organization* 137 (2d ed. 1994).

monopoly position. See Areeda & Hovenkamp ¶ 600a, at 3 (setting out first two prongs identified above and articulating the two "subsidiary questions": (3) "given that § 2 requires some element of conduct in addition to substantial market power, what kinds of conduct or intent transform power into unlawful monopolization; and (4) what defenses, if any, save monopoly power from condemnation?").

The statutory text does not provide the answers, but case law over more than a century provides extensive guidance. Courts recognize various types of conduct that have the potential to harm competition. The types of conduct alleged in this case are "exclusionary" in nature, impairing rivals' opportunity to compete in a way that is inconsistent with "competition on the merits." Areeda & Hovenkamp ¶ 650a, at 92; see also *id.* ¶ 651b, at 99–100; *Covad Communications Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 675–76 (D.C. Cir. 2005) (agreeing with plaintiff's description of defendant's refusal to deal as "'predatory' … because, in the vernacular of antitrust law, a 'predatory' practice is one in which a firm sacrifices short-term profits in order to drive out of the market or otherwise discipline a competitor").

In the present case, Viamedia alleges and has offered evidence that Comcast: (1) refused to deal with Viamedia by denying it Interconnect access, and (2) engaged in tying by denying MVPDs Interconnect access unless they purchased Comcast's ad rep services.[11] We set out below the legal tests for refusals to deal and tying, which help in assessing whether

---

[11] To "simplify the issues" on appeal, Viamedia elected not to pursue exclusive dealing as a distinct theory of liability.

such conduct is anticompetitive and illegal, or instead harmless or even procompetitive.

Conduct that can harm competition may fit into more than one of these court-devised categories. After all, the "means of illicit exclusion, like the means of legitimate competition, are myriad." *Trinko*, 540 U.S. at 398, quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc). Although "the standard for a § 2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct." Areeda & Hovenkamp ¶ 777a, at 324. This means that a dominant firm's conduct may be susceptible to more than one court-defined category of anticompetitive conduct. A "simple refusal to deal" is conduct where one firm "refuses to deal no matter what," whereas "[t]ying and exclusive dealing are two common examples" of "conditional refusals to deal"—i.e., one firm will refuse to deal with another firm unless "some condition is met." Herbert Hovenkamp, *FRAND and Antitrust*, Cornell L. Rev. (forthcoming 2020) (manuscript at 11), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3420925. Similarly, "[m]any of the practices that have been characterized as exclusive dealing could also be described as tying" because "[t]he economic distinction between the two is most often slight or nil." Areeda & Hovenkamp ¶ 1800b, at 7–8, ¶ 1800a, at 4.

The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct "must harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58; see also *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove

harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). At bottom, the purpose of identifying these categories of conduct is to help determine "the presence or absence of harmful effects, which are both the reason for any antitrust concern and often the simplest element to disprove." Areeda & Hovenkamp ¶ 1701d, at 33. We therefore start by assessing how Comcast's conduct fits into these categories under Section 2, mindful that we should stay focused on the effect Comcast's conduct has on competition.

### 1.  *Refusals to Deal*

The district court dismissed on the pleadings the portion of Viamedia's complaint focused on a refusal-to-deal theory. We review *de novo* a grant of a motion to dismiss, "constru[ing] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [its] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008); see also *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018) (in reviewing dismissal for failure to state a claim, we accept facts alleged by plaintiff without vouching for their objective truth). We next set out the general principles underlying a refusal-to-deal claim and then explain how the leading case—*Aspen Skiing*—maps onto Comcast's conduct. We then reject Comcast's argument that Viamedia's claim could properly be dismissed on the pleadings.

### a.  *Monopolists and Refusals to Deal*

Monopolists are both expected and permitted to compete like any other firm. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986). A monopolist is not obliged to "watch[] the quality of its products deteriorate and its customers

become disaffected" and "lie down and play dead" because "even a monopolist is entitled to compete." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000). "Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal." *Id.*; see also *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017). And just because "a firm has monopoly power doesn't mean that the law should prevent it from competing," as "[i]t would be absurd to require the [monopolist] to hold a price umbrella over less efficient entrants." Richard A. Posner, *Antitrust Law* 196 (2d ed. 2001). Thus, the general rule is that even monopolists "are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 448 (2009), citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

Yet there are "limited circumstances" under which a monopolist's refusal to deal with another party will be illegal anticompetitive conduct. *Id.*; see also Areeda & Hovenkamp ¶ 1800c5, at 21 ("Section 2 of the Sherman Act reaches unilateral refusals to deal when the refusals constitute monopolization … ."). For example, in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), a monopolist newspaper was "an indispensable medium of advertising for many" local businesses but refused to deal with any advertiser who placed any ad with a new radio competitor in an effort "to destroy and eliminate" the new competitor. *Id.* at 152, 150. The Court was not persuaded by the newspaper's argument that it had "a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases." *Id.* at 155.

In a holding that resonates in this case, *Lorain Journal* explained: "*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Id.*, quoting *Colgate*, 250 U.S. at 307; see also *Goldwasser*, 222 F.3d at 397 (acknowledging circularity of *Colgate* test). With the newspaper's clear expectation that it would "outlast" the new competition and regain its complete monopoly, and with "no apparent efficiency justification for its conduct," *Lorain Journal* has been described as "entirely correct." Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 344–45 (2d ed. 1993). This theory of liability was endorsed again in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the leading case on this issue.

### b. *Aspen Skiing and Comcast*

Comcast takes the position that after the Supreme Court's 2003 *Trinko* decision, any "antitrust claims based on a duty to deal with rivals 'bit the dust.'" In the face of both *Aspen Skiing* and the actual language of *Trinko*, we must reject that argument about what the law should be. *Trinko* itself said just the opposite: "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2," and the "leading case for § 2 liability based on refusal to cooperate with a rival … is *Aspen Skiing*." 540 U.S. at 408; see also *Linkline*, 555 U.S. at 448 ("There are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability."), citing *Aspen Skiing*, 472 U.S. at 608–11.

What do those limited circumstances look like? In addition to reiterating *Aspen Skiing*'s continued, albeit narrow, validity, the Court has also provided useful guidance on primary factors to consider when determining whether potentially anticompetitive conduct falls within *Aspen Skiing's* bounds. To provide background on what role those factors play in a court's analysis, we summarize the facts of *Aspen Skiing*, focusing on the primary factors the Supreme Court has continued to highlight.

The case involved four ski mountains that were initially developed and operated under separate ownership. 472 U.S. at 587. For over a decade, the four mountains offered a variety of ski-lift tickets and packages, including a joint ticket that allowed skiers to gain convenient access to all four mountains. *Id.* at 588–89. Even as defendant Aspen Skiing Company (Ski Co.) came to control three of the four mountains, thus gaining market power over the Aspen ski area, the joint "interchangeable ticket" program continued to include the fourth mountain, which was independently owned by plaintiff Aspen Highlands Skiing Corporation (Highlands). *Id.* at 590–92. Revenues from this cooperative arrangement were distributed according to mountain usage. The joint ticket was a popular and profitable package for both parties. The four-mountain package outsold by a two-to-one margin the Ski. Co. packages that offered access to only its three mountains. *Id.* at 592.

Ski Co. management concluded, however, that if the four-mountain ticket were not available at all, customers would default to buying just Ski Co.'s three-mountain pass. Ski Co.'s president explained that "the 4-area ticket was siphoning off revenues that could be recaptured by Ski Co. if the ticket was

discontinued." *Id.* In the following year's negotiations, Ski Co. made a revenue share offer to Highlands on such unfavorable terms that Ski Co. correctly expected Highlands "could not accept" it. *Id.* The joint ticket was no longer offered. *Id.* In an attempt to stanch the flow of lost business, Highlands "tried a variety of increasingly desperate measures to re-create the [four-mountain] joint ticket," including "offering to buy the defendant's tickets at retail price." *Trinko*, 540 U.S. at 408–09, citing *Aspen Skiing*, 472 U.S. at 593–94. Ski Co. refused to permit Highlands even to "pay full retail value for the daily lift tickets," with a Ski Co. official explaining, "we will not support our competition." *Aspen Skiing*, 472 U.S. at 593–94 n.14. Highlands filed suit.

At trial, defendant Ski Co. primarily relied on the testimony of its economic expert, which included the theory that Ski Co.'s conduct had such procompetitive justifications as eliminating "free-riding by Highlands."[12] Ski Co. offered evidence that its own product was being devalued by being associated with "the inferior skiing services offered at Highlands." *Aspen Skiing*, 472 U.S. at 609–10. Ski Co. also argued that it could save administrative expenses and other costs by eliminating the joint ticket, which Ski Co. found "administratively cumbersome." *Id.* at 592. In short, defendant Ski Co. argued that "the conduct at issue was pro-competitive conduct that a monopolist could lawfully engage in." *Id.* at 599.

Procompetitive justifications were also highlighted in the jury instructions. The jury was instructed that a monopolist

---

[12] See George L. Priest & Jonathan Lewinsohn, *Aspen Skiing: Product Differentiation and Thwarting Free Riding as Monopolization*, in *Antitrust Stories* 248 (Eleanor M. Fox and Daniel A. Crane, eds., 2007).

"is not barred from taking advantage of scale economies by constructing a large and efficient factory," nor is it "under a duty to cooperate with its business rivals … if valid business reasons exist for that refusal." *Id.* at 597. Ski Co. could be found liable only if it "gained, maintained, or used monopoly power in a relevant market by arrangements and policies which rather than being a consequence of a superior product, superior business sense, or historic element, were designed primarily to further any domination of the relevant market." *Id.* Therefore, "if there were legitimate business reasons for the refusal [to deal], then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law," because the law is not concerned with conduct which may "benefit consumers by making a better product or service available"—only conduct that "has the effect of impairing competition." *Id.* at 597. The jury "resolved all contested questions of fact in Highlands' favor," *id.* at 599, including a finding "that there were no valid business reasons for the refusal." *Id.* at 605.

The Supreme Court upheld the jury verdict for the plaintiff. The Court reiterated *Lorain Journal*'s rejection of the argument that "the right to refuse to deal with other firms … is unqualified." *Id.* at 601–02 & n.27, citing *Lorain Journal*, 342 U.S. at 155, and *Colgate*, 250 U.S. at 307. This conclusion was supported by three key factors.

First, Ski Co. "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years," including after "the character of the market was changed by Ski Co.'s acquisition of monopoly power." *Id.* at 603. Such a pre-existing relationship supports a presumption that the joint arrangement

was efficient and profitable. *Trinko*, 540 U.S. at 408–09 (distinguishing *Aspen Skiing* from situation where that presumption would not apply—e.g., a defendant who would never have "voluntarily engaged in a course of dealing with its rivals … absent statutory compulsion"); see also *Linkline*, 555 U.S. at 450 (refusing to impose a duty to deal on a defendant when "such duty arises only from FCC regulations, not from the Sherman Act"). The Court explained in *Aspen Skiing*:

> In any business, patterns of distribution develop over time; these may reasonably be thought to be more efficient than alternative patterns of distribution that do not develop. The patterns that do develop and persist we may call the optimal patterns. By disturbing optimal distribution patterns, one rival can impose costs upon another, that is, force the other to accept higher costs.

472 U.S. at 604 n.31, quoting Robert H. Bork, *The Antitrust Paradox* 156 (1978).

Second, the Court compared Ski Co.'s conduct in the Aspen market with Ski Co.'s arrangements in comparable markets where it lacked such dominance, noting that cooperative joint tickets were "used in other multimountain areas which apparently are competitive." *Aspen Skiing*, 472 U.S. at 603–04 & n.30. The Court could thus "infer that such tickets satisfy consumer demand in free competitive markets." *Id.*

Third, defendant Ski Co. decided to forgo profitable transactions by refusing to permit Highlands to purchase ski tickets at the retail price for the sake of harming Highlands. 472 U.S. at 608 ("The jury may well have concluded that Ski Co.

elected to forgo these short-run benefits because it was more interested in reducing competition … over the long run by harming its smaller competitor."). Ski Co. made this "decision to avoid providing any benefit to Highlands even though accepting the coupons would have entailed no cost to Ski Co. itself, would have provided it with immediate benefits, and would have satisfied its potential customers." *Id.* at 610.

These factors all pointed to Ski Co.'s conduct causing anticompetitive harm. But whether its conduct "may properly be characterized as exclusionary" also required consideration of possible procompetitive justifications, including any beneficial or harmful impacts on consumers or competition itself. *Id.* at 605, citing Bork, *Antitrust Paradox* at 138. Critical to this case, the Court treated procompetitive justification as a factual issue properly resolved by the jury. The Court focused on "the evidence relating to Ski Co. itself, for Ski Co. *did not persuade the jury* that its conduct was justified by any normal business purpose." *Id.* at 608 (emphasis added). Conflicting evidence presented at trial undermined Ski Co.'s arguments that the joint ticket was "administratively cumbersome" (no more so than the joint tickets Ski Co. used in other, competitive markets) and that Highlands' "inferior skiing services" were free-riding on Ski Co.'s services (a joint ticket "allowed consumers to make their own choice on these matters of quality"). *Id.* at 608–10.

Highlands refuted Ski Co.'s procompetitive justifications with exactly the kind of evidence that is helpful to prove exclusionary conduct or "predation," including "statements made by the officers or agents of the company, evidence that the conduct was used threateningly and did not continue when a rival capitulated, or *evidence that the conduct was not*

*related to any apparent efficiency.*" *Id.* at 608–09 n.39, quoting Bork, A*ntitrust Paradox* at 157 (emphasis in *Aspen Skiing*). The Court concluded that "the evidence supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 611.

The *Aspen Skiing* factors help case-by-case assessments of whether a challenged refusal to deal is indeed anticompetitive, even though no factor is always decisive by itself. For example, even "a monopolist might wish to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly procompetitive ends—say, to pursue an innovative replacement product of its own." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.). Similarly, forgoing short-run profits may sometimes reflect desirable, procompetitive behavior, such as efforts to offer "promotional discounts." *Id*. And a defendant may have "procompetitive rationales for treating a rival differently," such as if "it's more costly to deal with distant rivals than other nearby customers." *Id.* at 1078 n.4. But because the factors as a whole provide a window into likely harm to competition, a court should start with the *Aspen Skiing* factors in determining whether a refusal to deal is unlawful.

The Supreme Court has described *Aspen Skiing* as "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Given the facts we must assume here, Viamedia has presented a case that is well within those bounds and appears stronger than *Aspen Skiing*. A comparison of Viamedia's allegations to the facts found by the jury in *Aspen Skiing* (and

which the Supreme Court considered significant to its analysis) is instructive:

| ASPEN SKIING | VIAMEDIA ALLEGATIONS |
|---|---|
| Long-term business relationship that created joint offering | Same |
| Relationship existed absent any statutory obligation/duty (*Trinko*) | Same |
| Can presume prior relationship was thus mutually advantageous | Same |
| Sudden course reversal | Same |
| Course reversal came at a monetary loss for defendant | Same |
| Refused to sell service/product at retail price | Same |
| Sold product at retail price to others in the relevant market | Same |
| Unhappy customers | Same |
| Discouraged customers from doing business with its smaller rival | Same |

| Defendant continued to deal with competitors in other competitive markets | Same |
|---|---|
| Procompetitive justifications are a question for the factfinder | Same |
| Exclusionary conduct aimed at the only other competitor in the market | Same |
| Ski Mountain Passes | Different: Ad Rep Services |

In light of the similarities, unless the Court meant to limit *Aspen Skiing* to ski resorts, we see no sound basis to distinguish Viamedia's case as a matter of law. Comcast's alleged conduct, absent compelling evidence to the contrary, indicates its "calculation that its future monopoly retail price would be higher" by foreclosing its ad rep services competitor. *Trinko*, 540 U.S. at 409. In addition, unlike in *Aspen Skiing*, where the ultimate customers were skiers who did not compete against the defendant ski resort, Comcast's refusal to deal with Viamedia has left its MVPD customers in these markets no practical choice but to turn over their ad sales business, along with their sensitive business information and a large percentage of their ad revenue, to their dominant MVPD competitor.

> c. *Refusals to Deal and Motions to Dismiss*

Comcast nonetheless contends this case can be decided on the pleadings because "there is no liability under *Aspen Skiing* where, as here, the defendant's alleged termination of a pre-existing course of dealing was not 'irrational but for its anticompetitive effect.'" Comcast relies on the district court's

acceptance of Comcast's thinly supported assertion that it had a "valid business purpose" in refusing to deal with Viamedia because Comcast's replacement of Viamedia as WOW!'s and RCN's ad representative is a course of conduct that "offers *potentially* improved efficiency." See 218 F. Supp. 3d at 698–99 (emphasis added). Comcast contends this "valid business objective" is what "distinguishes this case from *Aspen Skiing*, where the defendant 'fail[ed] to offer any efficiency justification whatever for its pattern of conduct.'" Appellees' Br at 27, quoting *Aspen Skiing*, 472 U.S. at 608.

Comcast's argument has the facts wrong. Its reading fails to comport with the actual language of the opinion, the jury instructions, and the evidence presented by both parties. In *Aspen Skiing* the Court was reviewing a jury verdict. Only after a month-long trial had the jury "resolved all contested questions of fact in Highlands' favor" and "concluded that there were no valid business reasons for the refusal." *Aspen Skiing*, 472 U.S. at 599, 605. The Court concluded that "the evidence *supports an inference* that Ski. Co. was not motivated by efficiency concerns." *Id.* at 610 (emphasis added).

Comcast next cites *Novell* in support of its argument that a factual dispute regarding the existence of procompetitive justifications is appropriate for resolution on the pleadings. Yet *Novell* was a decision based on an eight-week trial. 731 F.3d at 1066. And what about *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986)? That decision followed a "trial [that] lasted more than six weeks and produced the usual mountain of testimony and exhibits." *Id.* at 372. Valid business justifications are relevant only to the rebuttal of a *prima facie* case of monopolization.

Thus, balancing anticompetitive effects against hypothe-sized justifications depends on evidence and is not amenable to resolution on the pleadings, at least where the plaintiff has alleged conduct similar to that in *Aspen Skiing*. See also, e.g., *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1482 (7th Cir. 1991) ("Whether valid business reasons motivated a monopolist's conduct is a question of fact."). Adapting language from our colleagues in the D.C. Circuit, the correct approach in this situation requires a district court to acknowledge that:

> [Comcast's] defense—that its refusal to deal was economically justified—depends upon a question of fact and therefore is not cognizable in support of a motion to dismiss. It is, of course, entirely possible [Comcast] will be able to prove … [that] its refusal to deal was a reasonable business decision. On the other hand, it is also possible [Comcast's] refusal to deal reflected its willingness to sacrifice immediate profits from the sale of [Interconnect access] in the hope of driving [Viamedia] out of the market and recovering monopoly profits in the long-run. … The district court cannot choose between these competing explanations without first resolving questions of fact not before it upon a motion to dismiss.

*Covad Communications Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (reversing dismissal of refusal-to-deal claim on pleadings). This analysis must also include the harm from Comcast's alleged tying conduct, which we turn to below. Viamedia has alleged—and offered evidence of—

enough harm to competition from Comcast's refusal-to-deal and tying conduct for its claim to go forward. Consideration of procompetitive justifications must wait for a comprehensive rule of reason analysis.

i.  *Comcast's Proposed Legal Standard*

Comcast both misunderstands the law and relies on inapposite cases by conflating the vertical integration of its MVPD and ad rep services functions with its control over the cooperative Interconnects and alleged misuse of that power. Comcast proposes that if a defendant merely postulates "a valid business purpose"—apparently including any business purpose a defendant could dream up, regardless of feasibility or value—that "ends the inquiry." "[T]here is no 'balancing' of benefits and harms," Comcast declares. In support of that proposition, Comcast points to the United States' Amicus Brief (in support of neither party) filed in this case, which offers a test dubbed the "no economic sense test." Appellee Br at 27–28; see also United States Brief at 11–12 (relying on the formulation articulated in the United States' amicus brief in *Trinko*, available at 2003 WL 21269559, and elaborated upon in Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test*, 73 Antitrust L.J. 413, 422–25 (2006)).

The proposed "no economic sense" test would condemn conduct as "exclusionary or predatory" only if it "would make no economic sense for the defendant but for its tendency to eliminate or lessen competition." United States Brief at 11. A "gross benefit [or gain] for the defendant" is not enough, however: "Conduct fails the no economic sense test if it is expected to yield a negative payoff, *net of the costs of undertaking the conduct, and not including any payoff from*

*eliminating competition.*" Werden at 416 (emphasis added). Or—as explained by the government at oral argument here— it is an objective "balancing" test that requires more than just "a slight procompetitive benefit or efficiency gain."[13]

This test is essentially the same one employed by the Tenth Circuit in *Novell*, which noted that "the monopolist's conduct must be irrational but for its anticompetitive effect." 731 F.3d

---

[13] Comcast's confusion may stem from the terse proposed name of "no economic sense," which does not appear to invite balancing. The test is actually more nuanced than the name suggests, and it is not meant to resolve every Section 2 challenge. As Werden sensibly notes, its "utility … ultimately is apt to vary," and we "should not presume that a single test must resolve every exclusionary conduct case." Werden at 421 & n.31.

Furthermore, it has been observed that although the "no economic sense" test "offers good insights into when aggressive actions by a single firm go too far," it "can lead to erroneous results unless" one also "seek[s] to 'balance' gains to the monopolist against losses to consumers, rivals, or others." Areeda & Hovenkamp ¶ 651b3, at 106–07. Otherwise we could arrive at absurd outcomes: "Theoretically, an act might benefit the defendant very slightly while doing considerable harm to the rest of the economy, and it would be lawful." *Id.* It is possible the test could be adapted to meet these criticisms, given that a court should not consider any gain from eliminating competition, but—in any event—the "no economic sense test" was not intended to displace all other approaches. Rather, it "is likely to be most useful as one part of a sufficient condition: If challenged conduct has a tendency to eliminate competition and would make no economic sense but for that tendency, the conduct is exclusionary." Werden at 418. Areeda and Hovenkamp also suggest a broader approach, in which harm "wholly disproportionate" to the valid business justification can also support a refusal-to-deal-claim. ¶ 772c2, at 223 ("Condemnation would be appropriate only for conduct that (1) clearly injures an actual or prospective rival either (2a) with no good business justification at all, or (2b) with a business justification that is poorly fitted to the result or wholly disproportionate to the harm that is inflicted.").

at 1075, citing *Aspen Skiing*, 472 U.S. at 597, *Trinko*, 540 U.S. at 407, and Werden at 422–25. However formulated, this test is aimed in part at the potential overweighting of the *Aspen Skiing* factor of a defendant forsaking short-term profits. *Id.* As noted, this factor is relevant but should not always be dispositive because "a short-term profit sacrifice is neither necessary nor sufficient for conduct to be exclusionary." Werden at 424; see also *id.* ("short-run profit sacrifice also is not necessary for conduct to be exclusionary because the anticompetitive gains from exclusionary conduct sometimes can be reaped immediately"); Areeda & Honvenkamp ¶ 651b3, at 107 ("monopolizing conduct is not necessarily costly to the defendant").

Because the *Aspen Skiing* factors are helpful but not dispositive, this more nuanced approach considering both procompetitive benefits and anticompetitive harms is necessary to answer the ultimate question of whether competition was harmed. The plaintiff ultimately needs to prove "that the monopolist's refusal to deal was part of a larger anticompetitive enterprise, such as (again) seeking to drive a rival from the market or discipline it for daring to compete on price." *Novell*, 731 F.3d at 1075. The result of such conduct is to harm competition by "entrench[ing] a dominant firm and enabl[ing] it to extract monopoly rents once the competitor is killed off or beaten down." *Id.*

As the above paragraphs suggest, and without our endorsing any particular catchy title for this analytical approach, the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard. Rule of reason cases "place[] a premium on objective tests based on evidence that is typically not in the defendant's exclusive control"—for example, Comcast's cost savings

and other efficiencies it may have obtained due to its conduct. See Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 86 (2018). This is why it is typically considered an "adequate pleading in a rule of reason antitrust case" for a plaintiff to allege (1) "evidence of market structure" (i.e., market power and relevant markets, which are not in dispute in this case) and (2) "exclusionary effect" (i.e., foreclosure of a competitor from a market, which is also not in dispute in this case)— "both of which can ordinarily be obtained without access to the defendant's own records—[and] indicate that an antitrust violation is plausible." *Id* at 90.

To the extent that refusal-to-deal claims require more at the pleading stage, it is enough to allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*. The Supreme Court said as much in *Trinko*, in which it affirmed dismissal of a complaint, distinguished *Aspen Skiing*, and emphasized that "the defendant's prior conduct sheds no light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted not by competitive zeal but competitive malice." 540 U.S. at 409. *Trinko* specifically identified the absence of two factors—a prior and voluntary course of dealing, and refusal to sell at retail price—in distinguishing *Aspen Skiing*. The former factor was important, because it "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.*, citing *Aspen Skiing*, 472 U.S. at 608, 610–611. In *Covad*, the D.C. Circuit adopted a similar, if slightly more explicit, holding that a plaintiff must eventually show a sacrifice of short-term profits to prevail on a refusal-to-deal claim and that alleging that a refusal to deal was "predatory" was sufficient at the pleadings stage. 398 F.3d at 675–76.

Viamedia's pleading adequately alleges an anticompetitive refusal to deal. As described above, Viamedia's claim closely tracks *Aspen Skiing* and contains the key elements that were missing in *Trinko*: a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers. Certainly, no more is required. We leave open the question whether allegations of short-term losses are necessary to state a refusal-to-deal claim. A case might present itself in which other factors—such as a prior course of conduct, exploitation of power over a cooperative network, refusal to sell at retail price, and discriminatory treatment of rivals—could plausibly support the inference that a refusal to deal is "prompted … by anticompetitive malice." *Trinko*, 540 U.S. at 880. But this case is easier and does not require precise delineation of the requirements of a refusal-to-deal pleading.

Even if an allegation that a defendant's conduct was irrational but for its anticompetitive effect were necessary, Viamedia has plausibly alleged just that. In a section of the First Amended Complaint entitled "Comcast's Refusal to Deal with Viamedia is Irrational But for its Anticompetitive Effects," Viamedia walked through the long-term course of dealing prior to Comcast's conduct; the subsequent degradation of the value of the cooperative Interconnects; the financial losses suffered by Comcast itself, as well as by Viamedia and Comcast's competitor MVPDs; Comcast's willingness to offer Interconnect-only access in other markets where it did face competition; and the fact that "[t]here are no procompetitive justifications" to be achieved by the conduct given that there were "no material administrability problems in allowing Viamedia to participate in Interconnects" on behalf of its MVPD customers. First Am. Cplt. ¶¶ 154–68. Viamedia's allega-

tions—regardless of the standard applied—are more than sufficient to pass muster under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

With Viamedia meeting the appropriate pleading standard and presenting evidence of harm to competition, the remainder of the case should settle into the traditional analysis followed in rule of reason cases, with the burden shifting to Comcast, which "may, of course, introduce its own proof of inevitability, superior skill, or business justification." Areeda & Hovenkamp ¶ 650c, at 94. To be more specific, under this burden-shifting framework, once Viamedia has "successfully establish[ed] a *prima facie* case under § 2 by demonstrating anticompetitive effect, then [Comcast] may proffer a 'procompetitive justification' … a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Microsoft*, 253 F.3d at 59. If such a justification is offered, "the burden shifts back to [Viamedia] to rebut that claim." *Id*. If Viamedia cannot rebut the evidence of Comcast's procompetitive justifications, "then [Viamedia] must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id*. This burden-shifting has evolved based on which party has access to the various categories of evidence and information, with any evidence of procompetitive justifications likely to be under the defendant's control. Cf. United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 30 (Aug. 19, 2010) (Merger Guidelines) ("much of the

information relating to efficiencies is uniquely in the posses-
sion" of the firms seeking to justify a transaction).[14]

### ii. *Inapposite Vertical Integration Cases*

Comcast also relies on cases involving vertically inte-
grated defendants with facts that, in crucial ways, do not map
onto this case. In seeking to shoehorn this case into this cate-
gory, Comcast caused confusion in the district court—and
continues in this effort on appeal—by glossing over the unu-
sual market structures in this case and portraying itself as just
a "prototypical" vertically integrated firm. This misconcep-
tion is accomplished by conflating (1) Comcast's actual verti-
cal integration of its MVPD cable services with its ad rep ser-
vices functions with (2) its control over the cooperative Inter-
connects in the relevant geographic markets. Comcast's

---

[14] Courts apply a "similar balancing approach" in rule of reason cases,
whether alleged under § 1 or § 2. *Microsoft*, 253 F.3d at 59, citing *Standard
Oil Co. v. United States*, 221 U.S. 1 (1911). The Supreme Court has recently
reiterated this balancing test for a rule of reason § 1 case: "To determine
whether a restraint violates the rule of reason … a three-step, burden-shift-
ing framework applies. Under this framework, the plaintiff has the initial
burden to prove that the challenged restraint has a substantial anticom-
petitive effect that harms consumers in the relevant market. If the plaintiff
carries its burden, then the burden shifts to the defendant to show a pro-
competitive rationale for the restraint. If the defendant makes this show-
ing, then the burden shifts back to the plaintiff to demonstrate that the
procompetitive efficiencies could be reasonably achieved through less an-
ticompetitive means." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284
(2018) (omitting internal citations); see also Areeda & Hovenkamp
¶ 1820a, at 188, ¶ 1821, at 207 (observing that courts require "stronger
proof of offsetting efficiencies" when defendants possess greater ability to
foreclose rivals from the market).

argument for dismissal on the pleadings depends upon this confusion.

To start, "[e]ven a monopolist … is free to integrate, especially when integration creates no new monopoly in any second area." Areeda & Hovenkamp ¶ 1700j1, at 14–15. Such an integration allows the defendant to achieve cost-savings by "elimination of double marginalization." *United States v. AT&T, Inc.*, 916 F.3d 1029, 1036 (D.C. Cir. 2019). In other words, prior to vertical integration, the firms providing complementary products would "earn[] margins over cost before their products reached consumers." *Id.* at 1044. After integration, goes the theory, there is no need for two entities to earn margins over cost, and "the merged entity would eliminate that cost and … pass on some of those cost savings to consumers in order to attract additional" customers. *Id*. Thus, it would rarely be an antitrust violation for a firm to supply itself through vertical integration, and a plaintiff would not generally have a right under antitrust law to demand that a defendant forgo supplying itself from an in-house source. Areeda & Hovenkamp ¶ 1700j1, at 14–16 & n.35.

This principle has been illustrated in some Section 2 cases, in which a company claimed antitrust injury when a larger company vertically integrated and provided in-house what it formerly purchased from the smaller company. For example, in *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007), a company with a local monopoly in crushed stone (aggregate) sold the aggregate through two distributors. The aggregate monopolist decided to vertically integrate by purchasing one of the distributors and bringing all of its distribution in-house. *Id.* at 119. The remaining distributor alleged a Section 2 violation, claiming that "its injury

resulted from [defendant's] vertical integration into the distribution market." *Id.* at 120. The facts of *Port Dock* do not map onto the conduct of Comcast, which was already vertically integrated and was instead exploiting its control over the cooperative Interconnects.

Similarly, the defendant in *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009), owned the mountain on which it leased property to plaintiff, and "the creator of a resort has no obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property." *Id.* at 1193. Notably, the mountain was not a cooperative enterprise, and the customers (skiers) did not compete against the defendant mountain resort. And in *Novell* (which, recall, was a case that went to trial), defendant Microsoft was the sole owner of the intellectual property it had made available to independent software vendors. 731 F.3d at 1067. And again, the customers (computer users) did not compete against Microsoft.

These opinions about "prototypical" vertically integrated firms recognize, nevertheless, that different circumstances could support a cognizable antitrust claim in cases like this one. See *Port Dock*, 507 F.3d at 124–25 ("Vertical expansion by a monopolist, without more, does not violate section 2," unless there is an allegation of an "anticompetitive incentive to create a downstream monopoly," or other "special circumstances in which a monopolist's vertical expansion could be anticompetitive."); *Christy Sports*, 555 F.3d at 1196 ("We would not even preclude the theoretical possibility that such a change [by refusing to deal] could give rise to an antitrust claim, for example, if by first inviting an investment and then disallowing the use of the investment the [defendant]

imposed costs on a competitor that had the effect of injuring competition in a relevant market."); *Novell*, 731 F.3d at 1076 (plaintiff could have proven refusal-to-deal case against Microsoft, but at trial "presented no evidence from which a reasonable jury could infer that Microsoft's discontinuation of this arrangement suggested a willingness to sacrifice short-term profits, let alone in a manner that was irrational but for its tendency to harm competition").

Even if this were a vertical integration case, Viamedia adequately alleged that Comcast presented just such a "special circumstance." Its conduct eliminated its only competitor in the ad rep services market and increased control over its MVPD competitors in the retail cable market. But again, this is not a case of simple vertical integration. Comcast *is* vertically integrated and has been at all relevant times. No one objects to a vertically integrated Comcast offering both Interconnect services and ad rep services. Viamedia does not seek to force Comcast to buy ad rep services from Viamedia; nor does Viamedia seek to force Comcast to allow Viamedia to re-sell or distribute Comcast's ad rep services. Viamedia simply wants to ensure that MVPDs can freely choose Viamedia as their supplier of ad rep services if that is their preferred choice.

Another distinguishing fact is that the Interconnects are joint, cooperative efforts among competing MVPDs. That distinguishes this case from cases involving vertically integrated defendants, as in *Port Dock*. Viamedia seeks to regain access to the Interconnects to operate on behalf of its MVPD customers. It is true that by virtue of acquiring numerous other cable companies, Comcast now controls the Interconnects at issue. But they are cooperative ventures that jointly set prices for

competitor MVPDs' spot avails. Comcast itself has described the Interconnects as a "collection of two or more cable TV systems that work together to distribute commercials to a wider geographic area than a single system would otherwise reach, giving advertisers the option to reach all cable households within a market with one buy." First Am. Cplt. ¶ 156.

The Interconnects' cooperative structure explains why Comcast describes itself not as an Interconnect "owner" but as an Interconnect "operator" and describes its function as a firm that "operates interconnects in DMAs including Chicago and Detroit." See, e.g., Appellees' Br. at 7. It also explains why Comcast describes Viamedia as having "participated in interconnects," and after being denied access, Comcast says, Viamedia sought "readmission." *Id*. Typical vertically integrated firms do not refer to themselves as the "operators" of their assets, and they do not describe their buyers as "participating" in the vertically integrated firms' services, let alone say that buyers might seek "readmission" to those services. Taking control of and exploiting control of a previously cooperative mechanism is *not* vertical integration.[15]

Accordingly, we reverse the Rule 12(b)(6) dismissal of Viamedia's claim for monopolization through an unlawful refusal to deal.

### 2. *Tying*

The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the

---

[15] Viamedia disputes the accuracy of describing Comcast as an Interconnect "owner." Deposition testimony characterizes an Interconnect simply as "an agreement between two or more MVPDs in a DMA to distribute commercials … across all partners in the interconnect."

tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Viamedia contends that Comcast conditioned the sale of Interconnect services (the tying product) on the purchase of ad rep services (the tied product). Viamedia alleges that Comcast engaged in anticompetitive conduct on two fronts. Comcast inserted itself between Viamedia and its competitor MVPDs by: (1) denying Viamedia access to the Comcast-controlled Interconnects, and (2) then using its control over the Interconnects to demand that its smaller MVPD competitors turn over to Comcast 100% of their spot avails, including the sale of local spots, an area in which Comcast and the MVPDs had formerly competed. Viamedia has offered evidence that this two-front strategy was successful. Comcast excluded its only competitor in the ad rep services market—gaining a pure monopoly. It also gained new control over and insight into its MVPD competitors that it could not have achieved otherwise.

The district court, however, granted summary judgment on Viamedia's tying claim, a decision we also review *de novo*. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018). "Summary judgment is appropriate only if there are no disputed questions of material fact and the moving party is entitled to judgment as a matter of law," so we "examine the record in the light most favorable to the [non-movant], granting [it] the benefit of all reasonable inferences that may be drawn from the evidence and reversing if we find a genuine issue concerning any fact that might affect the outcome of the case." *Id.* (citations omitted); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (on summary judgment, courts must

refrain from making credibility determinations or weighing evidence).

### a. *Summary Judgment Standard*

The district court applied, and Comcast argues for, a summary judgment standard that requires plaintiffs in Section 2 monopolization cases to present evidence that "tends to exclude the possibility" that a monopolist's conduct is just "as consistent with competition as with illegal conduct." 335 F. Supp. 3d at 1061, quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). The proper question on summary judgment is whether Viamedia has presented evidence to establish a genuine dispute of material fact as to whether Comcast engaged in exclusionary conduct forbidden by Section 2. See *Matsushita*, 475 U.S. at 585; *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 483 (1992); see also, generally, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015). When determining whether there is a "genuine issue of material fact … the substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48 (emphasis omitted). "The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak*, 504 U.S. at 467–68.

Viamedia's tying theory is not economically implausible, unlike the alleged twenty-year-long conspiracy to charge predatorily low prices in *Matsushita* itself. A competitor's claim that a rival used monopoly power in a tying product market to gain a monopoly in a tied product market is "facially anticompetitive and exactly the harm that antitrust laws aim to prevent." *Eastman Kodak*, 504 U.S. at 479. The

sufficiency of the tying claim depends on whether Comcast forced RCN and WOW! to buy its ad rep services. Our summary judgment inquiry can be framed in the language of *Matsushita*—are the facts "as consistent with" forcing as with noncoerced action?—but this formulation does not get us anywhere beyond the general summary judgment standard. In the following analysis, we ask whether Viamedia has presented evidence of forcing sufficient to create a genuine dispute for trial.

b. *Tying and Comcast's Conduct*

In granting summary judgment, the district court concluded that no reasonable jury could find as a matter of fact that Comcast tied Interconnect services to the purchase of its ad rep services. We respectfully disagree. Viewing the evidence in the light most favorable to Viamedia, and without making credibility determinations or weighing the parties' competing evidence, we conclude that Viamedia has offered sufficient evidence that Comcast illegally tied purchase of its ad rep services to the Interconnect access it already controlled.

First, it is undisputed that Comcast (a) has market power in the tying market for Interconnect services and (b) has now foreclosed all competition in the tied market for ad rep services. Second, there is substantial evidence that the cooperative Interconnects are a separate service from Comcast's ad rep services. Third, Viamedia offered evidence that Comcast forced its competitor MVPDs to become its customers for ad rep services if they also wanted to keep their access to the Interconnects.

i. *Definition*

Tying is conduct in which a firm will "sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958); see also *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008); Areeda & Hovenkamp ¶ 1700a, at 4. The seller will purchase the tied product "not because the party imposing the tying requirement has a better product or a lower price" but because the seller has "power or leverage" in the market for the tying product. *Northern Pacific Railway*, 356 U.S. at 6.

Tying is still nominally subject to a per se rule of illegality, but it is "a most peculiar per se rule." Areeda & Hovenkamp ¶ 1701c, at 31; see *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. at 26–29; *Eastman Kodak*, 504 U.S. at 462. [16] The factual elements that must be proven for a tying claim capture much of what must be demonstrated in a rule of reason case. Showing that the purchase of the tied product was forced uses many of the same concepts used to analyze refusals to deal: some assessment of market power, rough predictions of anti-competitive harm, and consideration of procompetitive

---

[16] We stay "still" because in recent years the Supreme Court has held that some categories of conduct that were formerly treated as per se illegal are now subject to a rule of reason analysis. See *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) (resale price maintenance no longer per se illegal, overruling *Dr. Miles Medical Co. v. John D. Park & Sons*, 220 U.S. 373 (1911)); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 57 (1977) (non-price vertical restraints no longer per se illegal, overruling *United States v. Arnold, Schwinn, & Co.*, 388 U.S. 365 (1967)); *State Oil Co. v. Khan*, 522 U.S. 3, 22 (1997) (vertical maximum price restraints no longer per se illegal, overruling *Albrecht v. Herald Co.*, 390 U.S. 145 (1968)).

justifications. See, e.g., *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 44 (2006) ("While some such [tying] arrangements are still unlawful, such as those that are the product of a true monopoly … that conclusion must be supported by proof of power in the relevant market.") (citation omitted); *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 593–94 (7th Cir. 2008) (describing the tying rule and its market-power requirement); Areeda & Hovenkamp ¶ 1760(b), at 379 (noting that, even when treated as per se illegal, "the Supreme Court has almost always been willing to consider a defendant's offered justifications").

"When the defendant is a dominant firm" and meets "a much stricter power requirement," however, the "special screening function" of the tying factors is "largely unnecessary, and the more general standards of § 2 become relevant" because "the technical requirements … attach only to per se ties." Areeda & Hovenkamp ¶ 777, at 324. Thus, "when the defendant is a monopolist in the 'tying product,'" it may be superfluous to go through a detailed inquiry into whether there are "separate products." *Id.* ¶ 617b2, at 52–53; see also *id.* ¶ 777, at 324–25 & n.9 (noting that in *Eastman Kodak*, the Supreme Court treated a conditional refusal to sell parts without service as a tying arrangement, although on remand the tying claim was dropped and a Section 2 violation was found without any "separate products" requirement); *United States v. Microsoft Corp.*, 253 F.3d 34, 96–97 (D.C. Cir. 2001) (en banc). Similarly, "[w]hen a defendant's market share and the underlying market structure make monopolization or attempt plausible, then a tie that contributes significantly to the maintenance or creation of monopoly power violates § 2 even though it is unilaterally imposed." Areeda & Hovenkamp ¶ 777, at 325.

Here, Comcast's monopoly power in the tying market of Interconnect services in the three metropolitan areas and its successful capture of a monopoly position in the tied market of ad rep services in the same areas are undisputed. And yet great effort has been made to parse whether Comcast's conduct satisfies some platonic ideal of tying conduct. We, too, walk through the tying factors at issue (separate product and forced purchase) and determine, taking the record as a whole, that Viamedia has provided sufficient evidence to create a question of fact as to each factor. Ultimately, the focus in this Section 2 case must remain on "whether, viewing the monopolist's conduct as a whole, it has unreasonably maintained or enhanced its monopoly position." *Id.* ¶ 777, at 324.

ii. *Separate Products or Services*

"[W]hether one or two products are involved turns … on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19; see also *Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products, there must be sufficient demand so that it is efficient for a firm to provide service separately from parts."); *Northern Pacific Railway*, 356 U.S. at 5–6. Comcast disputes whether Interconnect access and ad rep services are separate services. The district court assumed they are. On this record, that was correct.

The fact that buyers may wish to purchase and use two complementary products together does not, in and of itself, convert the two separate products into a single product. Rather, the market must "be assessed at the pre-contract rather than post-contract stage." Areeda & Hovenkamp ¶ 1802d6, at 89, citing *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961); see also *id.* ¶ 1802d6, at 88 (noting that a "grouping of sales covered by [a single] contract does not become a relevant

market for that reason"). In this case, RCN and WOW! viewed the services as separate prior to entering into their present contracts with Comcast.

Interconnect services and ad rep services are different functionally, as already described at length. See above at pages 10–24. To summarize, a provider of Interconnect services bundles and re-sells ads from multiple MVPDs in a regional market. An ad rep has a more direct relationship with an MVPD, directly representing it in regional and/or local ad sales, and potentially acting as its representative with an Interconnect. The "character of the demand" for the two services also differs, as demonstrated by how the market participants have sold and purchased the services. See *Jefferson Parish*, 466 U.S. at 19–21. Viamedia has offered only ad rep services for almost two decades. Comcast formerly offered the two services separately in the relevant DMA geographic markets. It continues to offer them separately in other DMAs. MVPDs like Comcast that also operate Interconnects "often have separate salespeople selling local advertising and selling Interconnect advertising." DA650. And the other alleged victims of Comcast's tying conduct—its smaller MVPD competitors—previously purchased these services separately and, as shown above, expressed strong interest in continuing to do so when Comcast was forcing them to buy the two together in Chicago, Detroit, and Hartford.

Comcast's claim that the two services are not distinct is also flatly inconsistent with one of Comcast's primary arguments on the next factor. In arguing that it did not force the MVPDs to buy its ad rep services, Comcast points to other DMAs where it sells Interconnect services separately. Even if there might be a viable factual dispute on whether it is

possible to consider these two services a single "unified market," which we doubt, that would be at minimum a question to "be resolved by the trier of fact." *Eastman Kodak*, 504 U.S. at 463. Comcast is not entitled to summary judgment on this ground.

### iii. *Forced Purchase*

Ample evidence shows that Comcast conditioned MVPDs' access to the Interconnects on hiring Comcast as their ad rep. Internal Comcast documents indicate that it ended its relationship with Viamedia specifically to obtain full-turnkey deals with the MVPDs. A216 n.84. Internal WOW! emails show that its executives understood that WOW! would have to hire Comcast for ad rep services if it wanted to regain access to the Interconnects. A215 n.81. RCN testified to the FCC that "Comcast will only allow RCN to join the interconnects if RCN employs Comcast spotlight instead of Viamedia." *Id*. A Comcast employee working in the Chicago and Detroit markets testified to the Department of Justice that Comcast had a business practice that "if an MVPD wants to get access to a Comcast [Spotlight] controlled Interconnect, it has to hire Comcast [Spotlight] as its ad sales representative." *Id*., A835. And a Comcast employee responded to the question "were you also clear … that Comcast Spotlight was interested only in a turnkey deal?" with "Direct relationship, full turnkey, yes, we made that clear to [WOW!]." A811. Both Comcast and the partial dissent offer explanations and rationales to try to defang these unusually explicit pieces of evidence. See Post at 136–37. On review of summary judgment, of course, Viamedia is entitled to the benefit of reasonable inferences and interpretations in its favor. The opposing

arguments are suitable for a trial but are not grounds for affirmance.

A jury could easily find that Comcast improperly forced the smaller MVPDs to buy its ad rep services using its monopoly in the Interconnect services market. The entire purpose of its refusal to deal with Viamedia—conceded repeatedly by Comcast—was to force RCN and WOW! to become full-turnkey clients for ad rep services. A789. Every party involved understood that this was the practical effect of banning from the Interconnects MVPDs that received ad rep services from Viamedia.

The fact that the arrangements were structured so that ownership of the slot avails passed from the MVPDs to Viamedia does not affect this analysis. In applying the antitrust laws, we care more about economic substance than about form. See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 760 (1984). Smaller MVPDs do not have their own ad rep services divisions. As a practical matter, they cannot self-provide ad rep services and must work with an ad rep to interface with the Interconnects. Given these dynamics, Viamedia offered sufficient evidence that Comcast explicitly used its control over the Interconnects to deny access to its competitor MVPDs or their agent to force RCN and WOW! to use Comcast's ad rep services for *all* spot avails, including the two-thirds of spot avails sold outside of the Interconnects, many of which used to be sold locally in competition with Comcast. See *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015) ("When a defendant adopts a policy that makes it unreasonably difficult or costly to buy the tying product (over which the defendant has market power) without buying the tied product from the defendant, it 'forces' buyers to buy

the tied product from the defendant and not from competitors."); *Microsoft*, 253 F.3d at 64 (liability appropriate where monopolist bars rival from "cost-efficient" means of distribution even if some means of distribution remain open).[17]

Because this is not a typical bundling case, Comcast's and the partial dissent's reliance on *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016), is misplaced. In that case, the plaintiff purchased Honeywell's replacement parts and then "bundle[d] parts and repairs in an effort to woo" the ultimate airline customers, in part reselling defendant's products. *Id.* at 1176. Moreover, Aerotec presented no evidence that Honeywell "explicitly or implicitly" tied or conditioned the sale of the tying product of parts to the ultimate airline customers' purchase of the tied product of maintenance. *Id.* at 1179. The court found compelling that "Honeywell allows

---

[17] The partial dissent insists that that there was no conditioning and that "RCN and WOW! maintained the ability to deal directly with Comcast and access the Interconnect without any ad representative should they choose not to employ Comcast." Post at 118–19 This is wrong as a matter of fact. As described above, every party involved—Comcast, RCN, and WOW!—understood that RCN and WOW! would be unable to access the Interconnects unless they hired Comcast to provide ad rep services. Even though its reasoning relies on the possibility that RCN and WOW! could access the Interconnects without Viamedia or Comcast, the partial dissent points to no evidence supporting that possibility. The record contains evidence of the opposite: RCN and WOW! needed to employ an ad rep services provider, and once Comcast refused to deal through their chosen intermediary, they had no practical choice but to obtain ad rep services from Comcast. As described above, substantial evidence shows that both RCN and WOW! understood themselves to be forced by Comcast into purchasing its ad rep services. A215 n.81. We cannot affirm summary judgment by overlooking that evidence about the realities of the parties' dealings and the economic realities of the market.

airlines to purchase parts and services in separate transactions from whichever supplier they please." *Id*. But Viamedia is not a bundler. It has presented substantial evidence of an explicit tie, and its former customers could not separately obtain Interconnect access.

There are other fundamental differences between the product offered in *Aerotec* and the one offered here. Honeywell sold airplane parts and repair services. Comcast, by contrast, operates a platform that is necessarily cooperative. RCN and WOW! are not just potential customers of Comcast as the airlines were potential customers of Honeywell. They are also Comcast's rivals in the retail cable market. Because self-providing ad rep services was not a viable option for RCN and WOW!, refusing to deal with their chosen intermediary had the effect of forcing them into much less desirable direct relationships with Comcast, their monopolist-competitor. Viamedia has presented evidence that the MVPDs were reluctant to be forced into their more powerful rivals' arms. A886–87. There was no evidence in *Aerotec* that the airlines felt similarly threatened, that providing repairs in-house was economically infeasible, or that the airlines viewed Honeywell as a necessary intermediary.

Comcast's reliance on *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), is even further off-base. That case involved "a world of robust market competition where [the ultimate customers] were free to take a package deal of promotion and venues, free to purchase those products separately, free to turn down both, and where they in fact exercised all those options to their advantage." *Id*. at 687. That does not bear even a passing resemblance to the markets here.

The district court's holding that Viamedia failed to offer evidence of forcing was premised on three assumptions: first, that the refusal-to-deal claim was correctly dismissed; second, that Viamedia acted as a reseller of Interconnect services rather than as the MVPD's agent for Interconnect access; and third, that RCN and WOW! could have purchased Interconnect-only access separately. Viewing the record as a whole, as we must, we disagree. We address each assumption in turn.

First, the district court acknowledged Viamedia's evidence that Interconnect access was conditioned on the purchase of Comcast's ad rep services. Yet the court discounted this evidence because such a condition could be explained by Comcast's "legal refusal to deal" rather than "an illegal tying." 335 F. Supp. 3d at 1061. This analysis fails on its own terms. As described above, Viamedia alleged a *prima facie* refusal-to-deal claim. Such potentially illegal conduct cannot justify Comcast's related tying of Interconnect services to ad rep services, and more fundamentally, a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary.

Second, the district court conflated access to the cooperative Interconnects, formerly granted uniformly to competing MVPDs or their ad rep services agents, with the Interconnect services themselves. The district court's conclusion that the MVPDs wanted a single entity to "make available to them both Interconnect Services and Ad Rep Services" is simply wrong as a matter of fact. Before Comcast excluded Viamedia, RCN and WOW! received Interconnect services from Comcast and ad rep services *separately* from Viamedia. The district court misunderstood Viamedia to be a reseller of Interconnect services as part of a bundle that included ad rep services, and

concluded there was no impermissible tying simply because Viamedia "could not offer that bundle" any longer due to Comcast's (supposedly) legal refusal to deal with Viamedia. 335 F. Supp. 3d at 1058 n.12. That characterization does not have a factual basis in the record, and it is certainly not beyond reasonable factual dispute. Even Comcast characterized Viamedia not as a reseller of Interconnect services but as a reseller of MVPD spot avails to the Interconnect operator. DA638. Comcast's characterization of ad rep services—including its own ad rep services provided to customer/competitor MVPDs—as reselling spot avails and disconnected from its MVPDs customers' best interests is troubling in its own right, but we return to that below. Neither the district court's nor Comcast's characterization of Viamedia's role was accurate.

As an ad rep services provider, Viamedia acted in the best interests of its MVPD customers and served as their agent or interface with the Comcast-controlled Interconnects for the one-third of MVPD spot avails that they sold cooperatively—not competitively—on a regional, DMA-wide basis. The district court acknowledged as much elsewhere in its opinion, explaining that MVPDs view "themselves as receiving Interconnect Services from interconnect operators (like Comcast) even when they have hired an unaffiliated Ad Rep (like Viamedia) on a full-turnkey basis." 335 F. Supp. 3d at 1058 n.10. We agree with the district court's latter characterization.

Third, in considering the summary judgment evidence, the district court drew inferences in favor of Comcast in concluding that RCN's and WOW!'s purchases of Interconnect services and ad rep services from Comcast were not forced. It did not credit RCN's and WOW!'s reasonable understanding

that Comcast was tying Interconnect services to ad rep ser-vices. The court (1) read Comcast's statements as more ambig-uous than they actually were; (2) concluded that, because the MVPDs ultimately purchased Comcast's ad rep services, they must have wanted both services to be provided by Comcast; and (3) pointed to out-of-market evidence to infer that Com-cast would have offered an Interconnect-only deal if only RCN and WOW! had asked for one. This analysis departed from summary judgment standards in several respects.

Even if Comcast's statements had been ambiguous, a plaintiff does not need an express, written declaration of a proposed tying arrangement. A sale on the announced or im-plied condition that the buyer purchase the tied goods from the seller ordinarily satisfies the tying-agreement require-ment. Areeda & Hovenkamp ¶ 1754b–c, at 315–20. Although it is not enough for the services to be merely complementary, a seller is not immunized from a tying claim if there is a fac-tual dispute as to whether the buyer wished to purchase the tied service (here ad rep services) from the defendant with market power in the tying service market (here Interconnect services). The MVPDs' ultimate decisions, after much finan-cial pain, to sign with Comcast for ad rep services do not dis-prove an illegal tie. (And notably, in Hartford, Frontier has continued to resist signing with Comcast for ad rep services and remains cut off from the Interconnects.) After all, "the great majority of tying and exclusive-dealing provisions that exclude rivals are engaged in by one market-dominating party and one party that is 'innocent' in the sense that it can-not profit from monopoly in the market, but is agreeing to the exclusivity only at the behest of the other party." Areeda & Hovenkamp ¶ 1803a, at 107 n.5.

Finally, the district court incorrectly inferred from the fact that Comcast offers Interconnect-only access in other local markets that RCN and WOW! could have obtained Interconnect-only access if only they had asked. That reasoning denies the non-moving party the benefit of reasonable inferences from the evidence. It also overlooks the evidence showing that in-house provision of ad rep services simply was not a practical option for RCN or WOW! in these markets.

More specifically, the evidence from other markets actually supports Viamedia's case, not Comcast's defense. It is undisputed that competition takes place within metropolitan (DMA) markets. If an advertiser wishes to purchase advertising time in the Chicago DMA, buying a spot avail in New Orleans is not an adequate substitute. Similarly, if Comcast was not permitting RCN an Interconnect-only deal in Chicago, an Interconnect-only deal in Denver was not an adequate substitute. And we summarized above at pages 24–35 the evidence indicating that RCN and WOW! did *not* willingly agree to Comcast's terms.

The Interconnect-only arrangements that Comcast offered in other DMAs, where it did not have (or exercise) so much market power, help Viamedia. Those arrangements show that Interconnect and ad rep services are indeed separate products. They need not be sold together. At the same time, Comcast's willingness to offer Interconnect-only access in other DMAs may reflect that Comcast does not have an overlapping footprint—i.e., does not compete—in those markets. In contrast, the evidence could support a finding that in Chicago, Detroit, and Hartford, Comcast tied Interconnect services to ad rep services to exclude its competitor in ad rep services and thereby force its MVPD competitors into its not-so-tender

arms. See Areeda & Hovenkamp ¶ 1744g, at 198–99 (explaining that bundling in non-competitive markets does not necessarily provide insight into whether a tie is efficient rather than reflective of increased market power exploitation, while unbundling in competitive markets likely reflects efficiencies). In drawing inferences in favor of the non-moving party, we must also recognize the possibility that Comcast was testing the waters in Chicago, Detroit, and Hartford with an eye toward expanding its tying demands to other markets if it is not held accountable.[18]

Outside of the district court's inconclusive comparison of other, more competitive markets, there was no basis in the record to support Comcast's speculation that if RCN and WOW! had just asked once more, Comcast would have abandoned its strategic plan and agreed to standalone Chicago and Detroit Interconnect access. To make such an inference, we would have to assume that the MVPDs went several years without access to the Interconnects, lost millions of dollars in advertising revenue, complained to Comcast and federal regulators, and then chose the ad rep services provider that they least preferred, all because of a mere misunderstanding.

---

[18] The partial dissent incorrectly looks to arrangements in other geographic markets to draw conclusions about forcing in the relevant markets. Post at 132–33. The ad rep services and Interconnect markets are distinct for each DMA. Viamedia's tying allegations and evidence focused on Comcast's conduct in Chicago, Detroit, and Hartford. The fact that Comcast did not simultaneously monopolize or attempt to monopolize ad rep services in other geographic markets is not a defense to its monopolization of Chicago, Detroit, and Hartford. The dissent's only support for its novel market-aggregating approach comes from a calculation of profit sacrifice in *Novell*, 731 F.3d at 1077, which has nothing to do with market definition or tying. See post at 133.

Comcast is free to offer this misunderstanding theory at trial, but the theory cannot support summary judgment. We reverse summary judgment for Comcast on Viamedia's tying claim.

C. *Section 2 Monopolization: Harms, Efficiencies, & Remedies*

Undisputed geographic markets, service markets, and market power make this case unusual. In addition, Viamedia has offered sufficient evidence to demonstrate *prima facie* claims for monopolization of the ad rep service markets in three DMAs through refusal to deal and tying. Comcast's actions also forced a new, intimate, and unwelcome relationship upon its smaller MVPD competitors. If credited, that evidence will shift to Comcast the burden to prove what would need to be some dazzling procompetitive benefits to justify its conduct. We set out below considerations for the district court to consider in the rule of reason analysis it will have to conduct on remand.

### 1. *Harm to Competition*

The potential harm in this case from Comcast's refusal to deal and tying ripples outward. Prior to Comcast's conduct, there was competition in three related markets: (1) between Comcast and other MVPDs for subscribers; (2) between Viamedia and Comcast in ad rep services; and (3) between Comcast and other MVPDs for the sale of spot avails in the local DMA market. By forcing out its only competitor in the market for ad rep services and forcing its MVPD competitors to turn over 100% of their spot avails, Comcast eliminated competition in the market for ad rep services and the market for the sale of local spot avails. At the same time, it gained the ability

to impair competition in the market for MVPD subscribers. These harms to competition are prototypical antitrust harms.

### a. *Ad Rep Services*

The ad rep services market went from two service providers to a single, monopolist provider. With no other ad rep services providers, the elimination of Viamedia unquestionably harmed competition. The harms that typically flow from a competitive market shifting to total control by a monopolist include potentially higher prices, lower output, and reduced innovation. The market at issue here may not have had time to show ultimate effects from total foreclosure. But Comcast is forthright about the fact that it has refused to allow Viamedia entry into other DMAs. Appellees' Br. at 35–36. The DMAs that have never had a competitive ad rep services market may provide useful comparison points to the relevant DMAs here, which are still governed by contracts that were signed while Viamedia was still trying to compete with Comcast.

### b. *The MVPD Market: MVPDs, Advertisers, Cable Subscribers*

Recall that the MVPDs faced three possible scenarios when Comcast refused to deal with Viamedia and then conditioned the MVPDs' access to the Interconnects on the MVPDs turning over all of their spot avails to Comcast's ad rep services arm. Above at pages 31–35. Each scenario entailed its own potential harm to competition.

The MVPDs elected the first scenario, giving in to Comcast and signing up for its ad rep services. To summarize, this arrangement has resulted in:

- Comcast's smaller MVPD rivals contributing additional revenue toward their dominant competitor;

- MVPDs turning over to Comcast the majority of spot avails they had formerly kept out of the Interconnects, a large portion of which are allocated to local ads (for which the MVPDs formerly competed against each other);

- RCN and WOW! being forced to trust that their dominant, incumbent cable rival Comcast will make ad sales decisions in the smaller competitors' best interests, despite Comcast's divided loyalties—as it is more profitable for Comcast to place ads in ways that are different from how RCN and WOW! might allocate them;

- Comcast gaining access to its competitor MVPDs' competitively sensitive information, including number and location of subscribers, ad sales, promotional ad materials to current and potential subscribers (including promotions trying to get customers to switch away from Comcast);

- And it is not just the MVPDs that have been harmed. Comcast is now the only seller of spot avails in the local market. As Viamedia's counsel noted at oral argument, local advertisers used to have several outlets to choose among at various price points when buying spot avails. Comcast is now their only-stop-shop, as well.

And recall that this was the MVPDs' *least*-bad choice—the one they chose when Comcast denied them their best option. Comcast and the district court hypothesized that Comcast was not actually barring competing MVPDs completely from Interconnect access. The hypothesis was instead that Comcast

would have permitted the MVPDs to have Interconnect-only access without using either Viamedia's or Comcast's ad rep services. In this scenario, Comcast would lose ad rep services revenue, but would not lose millions from forgoing Interconnect access fees and from its own spot avails being less valuable when placed through a degraded Interconnect.

But contrary to what the district court seemed to assume, this result still would have been harmful. Forcing RCN and WOW! to forsake the benefits they had gained by outsourcing ad sales to an independent Viamedia would have dramatically raised their costs. RCN and WOW! would have needed to hire staff, purchase technology, and pay for services that Viamedia had previously provided at lower cost. Those fixed costs would have been difficult for those MVPDs to afford, as shown by the fact that the option was always available in theory, and they never took it, and as shown by RCN's filing with the FCC and WOW!'s internal emails. A215 n.81.

In the other possible scenario, RCN and WOW! could continue working with Viamedia for ad rep services, but Comcast would continue barring them from the cooperative Interconnects. If the MVPD competitors had made that choice, they would have remained cut off from a large percentage of their advertising revenue.

Any loss of revenue or higher costs from these scenarios is not just a loss for competitors. It leads to a negative feedback loop in the market in which the MVPDs compete for cable subscribers, further harming competition. Higher costs and less advertising revenue lead to fewer promotional offers to subscribers and reduced expansion. See FCC 2007 Report and Order at 8 ¶ 13 ("Revenues from cable services are, in fact, a driver for broadband deployment," i.e., the build-out of

additional cable infrastructure). This in turn hampers RCN and WOW! from obtaining new cable subscribers or retaining the subscribers they already have (who may switch to Comcast). With a weakened RCN and WOW!, Comcast benefits further by not needing to offer the promotions it otherwise would have if it faced a more vibrant RCN or WOW!

To the extent that cable subscribers are left with higher priced and lower quality services and competition has been eliminated in the market for the sale of local spot avails, a trier of fact would have to account for that additional anticompetitive harm.

### c. *Back to the Interconnects*

Comcast's conduct also turned a previously procompetitive platform into a weapon to decrease competition in related markets. As originally conceived and implemented, the Interconnects appear to have been comfortably on the "reasonable" side of a rule of reason analysis for such cooperative ventures among competitors. See generally *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1 (1979). Comcast has described the Interconnects in these procompetitive terms, as a "collection of two or more cable TV systems that work together to distribute commercials to a wider geographic area than a single system would otherwise reach, giving advertisers the option to reach all cable households within a market with one buy." First Am. Cplt. ¶ 156. Consistent with that description, Comcast itself has told the FCC that "the revenue share in an interconnect is often the same for all participants, and fairly standardized across interconnects." Opposition to Petitions to Deny and Response to Comments at 279 n.883, *In the Matter of Applications of Comcast Corp., Time Warner Cable Inc., et al. for Consent to Assign or Transfer Control*

*of Licenses and Authorizations*, FCC MB Docket 14-57 (Sept. 23, 2014) (Comcast 2014 FCC Response). Which is as it should be if this cooperative mechanism is procompetitive rather than a weapon to inflict anticompetitive harm.

In congressional hearings on its proposed merger with TimeWarner Cable, Comcast highlighted the non-exclusionary nature of the Interconnects. A Comcast executive was sent to testify to a congressional committee about the proposed purchase. Much of the concern focused on the potential power of a combined Comcast/TimeWarner Cable to harm other content providers who relied on access to cable companies' "pipes" into the home (e.g., Netflix, YouTube). One Representative, however, asked about Comcast's actions with the Interconnects it controlled.

Comcast executive vice president David Cohen was asked to "provide assurances that Comcast will not exclude competitors or advertising firms from the advertising interconnects that Comcast operates." Cohen replied, "We are not in the business of excluding businesses who want to buy advertising from us." Cohen was again pressed: "So your short answer is that you are not going to exclude competitors or advertising … [f]rom the interconnects." "Correct." According to Viamedia's evidence, however, Comcast was in the midst of doing just what Cohen was denying.[19]

---

[19] Comcast abandoned the Time/Warner transaction after investigations by federal enforcement and regulatory agencies. The government's "significant concerns" about the merger were focused on the likelihood that it "would make Comcast an unavoidable gatekeeper for Internet-based services that rely on a broadband connection to reach consumers." DOJ Press Release, *Comcast Corporation Abandons Proposed Acquisition of Time Warner Cable After Justice Department and Federal Communications*

In this lawsuit, moreover, Comcast now argues that its control over the cooperative Interconnects is the *source* of its competitive advantage. If that were correct, it would call into question the legality of the Interconnects themselves. Antitrust law is rightly skeptical of mechanisms that permit competitors jointly to set prices and other terms of dealing. Collaboration between actual or potential competitors "can be rife with opportunities for anticompetitive activity." *American Society of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982).

Based on Comcast's portrayal and use of the Interconnects in this suit, such skepticism is now warranted. The government antitrust enforcement agencies provide guidance on competitor collaborations. A number of the factors that show anticompetitive effect appear to be met by the Interconnects *as now portrayed by Comcast*. The factors include whether the collaboration may:

- "[L]imit independent decision making or combine the control of or financial interests in production, key assets, or decisions regarding price, output, or other competitively sensitive variables;"

- "[O]therwise reduce the participants' ability or incentive to compete independently;"

- Potentially "facilitate[] explicit or tacit collusion through facilitating practices such as the exchange

*Commission Informed Parties of Concerns* (Apr. 24, 2015), at http://www.justice.gov/opa/pr/comcast-corporation-abandons-proposed-acquisition-time-warner-cable-after-justice-department (last visited on Feb. 21, 2020).

> or disclosure of competitively sensitive information or through increased market concentration;"
>
> - "Successfully eliminate[] procompetitive pre-collaboration conduct, such as withholding services that were desired by consumers when offered in a competitive market."

Federal Trade Commission and United States Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* § 2.2, at 6, § 3.31, at 12 (April 2000) (Collaboration Guidelines). Check, check, check, and check.

These red flags were not raised by the truly cooperative original concept of the Interconnects. Having taken control of at least some Interconnects, though, Comcast now has the ability—and now even claims the *right*—to use the mechanism as a *source of its competitive advantage over rivals*, distorting competition in related markets. The use of the Interconnects to take control of and set prices for competitors' local ads does not appear related to accomplishing the Interconnects' procompetitive goals. These facts weigh against Comcast, not for it.

### 2. *Procompetitive Justifications?*

The potential harms stemming from Comcast's conduct will not lead to Section 2 liability if Comcast proves that its monopoly in ad rep services "is a consequence of a superior product, business acumen, or historic accident," or if its conduct was the result of, or necessary to achieve, much greater procompetitive benefits. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); see also Areeda & Hovenkamp ¶ 650c, at 94–95. The procompetitive benefits typically recognized in antitrust law include evidence of "higher output, improved

product quality, energetic market penetration, successful re-
search and development, cost-reducing innovations, and the
like." Areeda & Hovenkamp ¶ 651d, at 119.[20] As this issue
must also be decided by a trier of fact on remand, we offer
some observations.

a.   *The Interconnects*

We start with Comcast's monopoly control over the Inter-
connects in Chicago, Detroit, and Hartford, which Comcast
has identified as the source of its competitive advantage that
permitted it, in turn, to gain monopoly control over ad rep
services. It appears that the only skill and foresight demon-
strated by Comcast in obtaining monopoly control over the
Interconnects was its ability to acquire a multitude of other
cable MVPD providers without facing a challenge from gov-
ernment antitrust enforcers. Comcast's acquisitions are not in
and of themselves evidence of superior skills, services, or ac-
cident.

What Comcast now identifies as a source of competitive
advantage was produced by the kind of mergers that the
agency Merger Guidelines describe as anticompetitive. The
Guidelines identify as their "unifying theme" the proposition
that "mergers should not be permitted to create, enhance, or

---

[20] "As a general matter, the evidence supporting a prima facie case
need not be as specific as the evidence supporting a procompetitive justi-
fication" because "[i]f the defendants have a procompetitive justification,
it must have been a motivating factor for the restraint, and the defendants
should be able to establish it rather easily." Herbert J. Hovenkamp, *The
Rule of Reason*, 70 Fla. L. Rev. 81, 107 (2018); see also *id.* at 110 ("To the
extent that the defendants' expectation of profit came from something
other than a restriction of competition, they should have evidence and are
in the best position to provide it.").

entrench market power or facilitate its exercise" by "enhancing [a firm's] market power." § 1, at 2. One example of an anticompetitive merger is directly on point:

> Merging Firms A and B operate in a market in which network effects are significant, implying that any firm's product is significantly more valuable if it commands a large market share or if it is interconnected with others that in aggregate command such a share. Prior to the merger, they and their rivals voluntarily interconnect with one another. The merger would create an entity with a large enough share that *a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market*. The interests of rivals and consumers would be broadly aligned in preventing such a merger.

Merger Guidelines § 2, at 6 (emphasis added). Comcast cannot now justify exclusionary conduct by pointing to control over the Interconnects, which was acquired through mergers that themselves may have been anticompetitive *precisely because of the risk that they could enable Comcast's exclusionary conduct*.

### b. *The Ad Rep Services Market*

Comcast's new monopoly position in the ad rep services markets in Chicago, Detroit, and Hartford, if we draw reasonable inferences in favor of Viamedia, is a result not of its superior services but of its exclusionary conduct. Any claimed benefits from that conduct must be procompetitive and not simply the result of eliminating competition. For example, if

Comcast has reduced advertising, promotions, or other incentives that it previously offered to customers or local retailers when competing with Viamedia, those savings would represent harm to competition. See *Covad Communications Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 674 (D.C. Cir. 2005), citing Bork, *Antitrust Paradox* at 314. Similarly, any savings gained by forgoing investments in research and development, infrastructure, or sales personnel, that otherwise would have been made under competitive conditions are properly categorized as harm to competition, not benefits. Finally, any defense premised upon the proposition that competition itself is inefficient, unreasonable, or confusing is not cognizable. See *National Society of Professional of Engineers v. United States*, 435 U.S. 679, 696 (1978).

Viewing the facts in the light most reasonably favorable to Viamedia, Comcast's procompetitive justifications seem to fall into this latter category. If Comcast could offer improved efficiencies by offering ad rep services and Interconnect services together to MVPDs, it was always free to do so. If this were the case, it could have passed on some of those savings to MVPD customers and possibly outcompeted Viamedia. Refusing to deal with the MVPD's representative of choice appears to be an attempt to avoid competition on the merits in the markets for ad rep services.

On the procompetitive side of the ledger, evidence of reduced pricing could offset harm—although current contracts may not yet reflect ultimate post-competition pricing. They were signed when Comcast was still bidding against Viamedia. And while protection against free-riding is generally recognized as a procompetitive goal, "[w]hen payment is possible, free-riding is not a problem because the 'ride' is not free."

*Chicago Prof'l Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 675
(7th Cir. 1992); see also Hovenkamp, *The Rule of Reason*, 70 Fla.
L. Rev. at 111, 113 ("Often instances of claimed free riding are
really complaints about competition, particularly when there
are joint costs," and "complete market exclusion is a suspi-
ciously excessive remedy for claimed free riding, even where
a certain amount of free riding actually occurs."). If Comcast
has evidence of truly procompetitive benefits, it should sub-
mit that evidence to the trier of fact. But the hypotheses it has
offered thus far do not entitle it to summary judgment.

3. *Remedies*

Comcast's final defense focuses on the challenge of reme-
dying its conduct. After all, Comcast points out, "Courts are
ill suited 'to act as central planners, identifying the proper
price, quantity, and other terms of dealing.'" *Pacific Bell Tele-
phone Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 452
(2009), quoting *Verizon Communications Inc. v. Law Offices of
Curtis V. Trinko*, 540 U.S. 398, 408 (2004). Call this the "So
what?" defense.

We agree that a court should not "impose a duty to deal
that it cannot explain or adequately and reasonably super-
vise." *Linkline*, 555 U.S. at 452–53, quoting *Trinko*, 540 U.S. at
415. Yet courts are often called upon to undertake compli-
cated, long-term supervision of complex cases and remedies.
The judiciary need not and should not adopt a posture of
learned helplessness in the face of proven antitrust violations.
For example, courts regularly preside over dozens, if not hun-
dreds or even thousands, of related cases in multidistrict liti-
gation that present complicated questions of liability, not to
mention supervising and implementing remedies over years
if not decades. See, e.g., *MDL 875 In re: Asbestos Products*

*Liability Litigation* (No. VI) (overseeing thousands of asbestos cases, including class actions, since 1991). Courts oversee the bankruptcy process for companies with complicated corporate structures and far-flung assets, supervising sales of those assets worth hundreds of billions of dollars. See, e.g., *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y.). And of course federal courts currently supervise at least 115,000 individuals on supervised release, implementing difficult-to-monitor and intrusive conditions limiting those individuals' jobs, the family and friends they can see, their drug and alcohol consumption, and locations to which they can travel, among others—all enforced through routine interviews of family and associates, electronic monitoring, drug tests, and random searches. Administrative Office of the United States Courts, *Overview of Probation and Supervised Release Conditions* 42–93 (Nov. 2016). In this antitrust case, we are not yet ready to cry "uncle" by affirming dismissal based on the unsubstantiated claim that this case poses "insoluble administrability problems."

In any event, this defense puts the cart before the horse. The trier of fact must first evaluate the evidence and determine whether Comcast's procompetitive justifications outweigh the anticompetitive harms from its conduct. If Comcast is found liable, the district court will then face a decision about appropriate remedies. That will be the time to face the practical problems Comcast hypothesizes.

The record thus far offers reasons to think the problems would be manageable. Comcast and Viamedia did business voluntarily, presumably on profitable terms for both. That history may well simplify the problems. As then-Judge Gorsuch wrote for the Tenth Circuit in *Novell*, evidence of that

earlier course of dealing "helps address, at least to some degree, administrability concerns—presumably profitable terms already agreed to by the parties may suggest terms a court can use to fashion a remedial order without having to cook them up on its own." 731 F.3d at 1075.

Moreover, Comcast itself told the FCC that this should not be an insoluble problem. It told the FCC that "the revenue share in an interconnect is often the same for all participants, and fairly standardized across interconnects." Comcast 2014 FCC Response at 279 n.883. Such comparison points (both within a given Interconnect and against other Interconnects in which Comcast sells or buys Interconnect-only access) may be used to establish a remedy that addresses pricing.

That being said, "Antitrust courts normally avoid direct price administration, relying on rules and remedies … that are easier to administer." *Linkline*, 555 U.S. at 453, quoting *Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.). If a pricing remedy proves too complicated, then structural remedies may be preferable. See, e.g., Areeda & Hovenkamp ¶ 600b, at 4 (even "[m]ildly reprehensible behavior might be enough to challenge a firm whose power is significant" and could justify imposing a more substantial remedy (e.g., "divestiture or dissolution" versus "an injunction")).

Comcast knows that courts are capable of overseeing structural and behavioral remedies (including ones that govern pricing disputes) that ameliorate competitive concerns. It agreed to such an arrangement as a condition for court approval of its challenged 2009 merger with NBC Universal. *United States v. Comcast Corp.*, 808 F. Supp. 2d 145, 147–48 (D.D.C. 2011) (Comcast agreeing to certain remedies to

prevent anticompetitive conduct post-merger). Such court-imposed and court-supervised remedies can also be imposed without a defendant's consent after a finding of liability. One obvious possibility would be to prohibit Comcast's control over Interconnects, which, in light of the evidence of misuse of that power to harm competition, raises serious problems under Section 1 of the Sherman Act.[21]

D. *Antitrust Injury*

A private civil plaintiff in an antitrust case must also establish "antitrust injury," which requires proof that its "claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (internal quotation marks and citations omitted). Viamedia has offered evidence of antitrust injury.

When a monopolist creates a monopoly in the tied market, rivals are often excluded from the market, thereby losing market share or sales. "In such cases courts ordinarily grant standing to the excluded or impeded rival." Areeda & Hovenkamp ¶ 1767a, at 449; see also *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 490 n.14 (1977) ("[C]ompetitors may be able to prove injury before they actually are driven from the

---

[21] An amicus brief filed in support of Comcast argued that any "relief for arbitrary refusals to deal should be left to the legislature." Brief for the Chamber of Commerce of the United States of America as Amicus Curiae in Support of Appellees at 25 (internal quotation marks omitted). The Chamber's argument that courts should not enforce Section 2 in refusal-to-deal claims is a policy position—and not one with which we are free to agree.

market and competition is thereby lessened. Of course, the case for relief will be strongest where competition has been diminished."). We have also often recognized that competitors suffer antitrust injury when they are forced from the market by exclusionary conduct. See, e.g., *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006) ("[T]his Court has recognized that competitors can bring an antitrust claim when they are excluded from the market and injured by defendants' actions."); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) ("When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly *or when a competitor is forced out of the market*, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition.") (emphasis added). This rule is integral to an effective antitrust regime because "the foreclosed rival's injury is entirely independent of the amount or existence of any injury to buyers." Areeda & Hovenkamp ¶ 1767a, at 449.

The general rule is that customers and competitors in the affected market have antitrust standing. See *Associated General Contractors*, 459 U.S. at 539; *McGarry & McGarry, LLC v. Bankruptcy Mgmt. Solutions, Inc.*, 937 F.3d 1056, 1065–66 (7th Cir. 2019), citing *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016), citing in turn *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."), and *SAS of P.R., Inc., v. P.R. Tel. Co.*, 48 F.3d 39, 45 (1st Cir. 1995) ("competitors and consumers are favored plaintiffs in antitrust cases"). Viamedia is not seeking relief based on a theory that competition should have been *reduced*. Cf.

*Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. at 488 (rejecting claim for loss of income that would have been earned if other competitors had been forced out of the market and competition had thus been reduced). Instead, Viamedia seeks only an opportunity for fair competition in the ad rep services markets, based on the quality and prices of its services. It is an appropriate plaintiff to seek damages based on exclusionary conduct that forced it out of that market.

Viamedia claims that Comcast's exclusionary conduct drove it from the ad rep services markets in Chicago, Detroit, and Hartford, thus reducing competition. Viamedia has presented evidence indicating that if Comcast not tied its sale of Interconnect services to ad rep services, RCN and WOW! likely would have continued to obtain ad rep services from Viamedia. The harm to competition is particularly pronounced since Viamedia was Comcast's only competitor in in the relevant markets. To the extent that Comcast engaged in exclusionary conduct, the evidence indicates that the exclusionary conduct caused Viamedia's injuries by forcing it from the ad rep services markets.

The partial dissent expresses great skepticism toward rivals' antitrust suits and argues that Viamedia cannot show antitrust injury on its tying claim. As a general matter, caution is appropriate. The partial dissent goes astray, however, by contending it is "uncommon" for a "single foreclosed rival" to have standing in a tying case. Post at 122–23. The leading tying cases and the leading treatise's specific, on-point discussion of antitrust standing in tying cases teach otherwise.

The foundational tying cases of the past 40 years were brought by tied-market rivals. *Eastman Kodak*, 504 U.S. 451; *Jefferson Parish*, 466 U.S. 2. The partial dissent cites no case law

for its assertion that such cases are "uncommon." It also does not cite any case in which an excluded rival in the tied market was found to lack antitrust injury. In the single tying case cited in the partial dissent's discussion of antitrust injury, the plaintiff lacked antitrust injury precisely because she was *not* participating in the tied market when the tie was allegedly implemented. See *Kochert*, 463 F.3d at 716.

And where Areeda and Hovencamp address antitrust standing in tying cases, they recognize that standing is appropriate in cases like this. Viamedia was competing with Comcast in the tied market for ad rep services. It was forced out of that market in Chicago, Detroit, and Hartford. Areeda and Hovencamp explain:

> Rivals in that market [the tied market] may be "foreclosed" when their entry or expansion is impeded or they lose existing market share or sales. Consumers lose the benefits of any entry, expansion, competition, or innovation that independent rivals might have injected into the tied market. *In such cases courts ordinarily grant standing to the excluded or impeded rival.*

¶1767a, at 449–50 (emphasis added); accord, *Eastman Kodak*, 504 U.S. at 479 (reversing summary judgment for defendant: market foreclosure in tied market resulting from illegal tying "is facially anticompetitive and exactly the harm that antitrust laws aim to prevent"). To the extent that the partial dissent suggests that the tying conduct at issue is not illegal or exclusionary, that goes to the merits, not to antitrust injury.

The partial dissent also suggests that Viamedia's injuries cannot establish antitrust injury because they are the same as

those alleged from the refusal to deal. Post at 125. This point also reflects only disagreement on the merits of the tying claim and the confusion that has stemmed from the different treatment of the two claims in the district court. Because the same general course of conduct supports both the refusal-to-deal and tying claims, the two theories necessarily allege similar injuries and damages.

E.  *Role of Expert Witnesses*

The final issue is the admissibility of expert testimony. We review the district court's exclusion for an abuse of discretion. *Salgado v. General Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998). If a discretionary ruling is based on an error of law, though, it can often be deemed an abuse of discretion. E.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990) (Rule 11 sanctions); *Ervin v. OS Restaurant Services, Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (class certification).

The district court struck Viamedia's expert testimony largely based on the view that Viamedia's claims should fail as a matter of law. We disagree with the district court's view of the law, so we reverse the court's rulings regarding Viamedia's expert witnesses.[22] We address separately the district court's ruling regarding a portion of Viamedia's expert economic witness, whom the court perceived as merely offering "lay" testimony, as well as an objection Comcast has raised on

---

[22] Viamedia offered Dr. Lys as an expert on damages issues. The only basis for excluding his opinion was that he assumed that Comcast's conduct had violated the antitrust laws and thus caused Viamedia cognizable harm, and the court had concluded that Viamedia could not legally prevail on its antitrust claims. As we are reversing the district court's legal rulings, the court's exclusion of Dr. Lys' expert opinion must also be reversed.

appeal that Viamedia failed to offer a causation expert, which Comcast believes should be fatal.

1. *Standard*

Expert opinion testimony is admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. An expert's opinion may "overlap[] with the jurors' own experiences" or "cover matters that are within the average juror's comprehension," so long as the expert uses some kind of "specialized knowledge" to place the litigated events "into context." *Lawson v. Trowbridge*, 153 F.3d 368, 376 (7th Cir. 1998) (citations omitted); see also *United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir. 1996) ("All you need to be an expert witness is a body of specialized knowledge that can be helpful to the jury.").

2. *Economic Expert Witness*

Viamedia offered Dr. Furchtgott-Roth as an expert witness on the economic rationales of Comcast's conduct and the competitive ramifications from such conduct. Setting aside the district court's ruling regarding Dr. Furchtgott-Roth's report based on the court's legal holdings, the court also excluded a portion of his testimony as offering only a lay impression of the market and Comcast's conduct.

Viamedia argues that Dr. Furchtgott-Roth's undisputed "specialized knowledge" would be helpful to a jury to place Comcast's conduct into context, and that there are some

complex facts in this case, "including the economic incentives faced by a set of interrelated firms in the two-sided market for spot cable advertising," which are not "obvious to the layperson."

Dr. Furchtgott-Roth clearly drew conclusions through "expert assessment," not merely a lay interpretation of the evidence. While he did summarize and repeat some relevant facts, he drew significantly on expertise to "add something"—context and supporting information—to the record. Viamedia contends that its exclusion from the Interconnects furthered Comcast's tying policy. Dr Furchtgott-Roth's opinion that self-provision is not a viable business option for smaller MVPDs is an expert interpretation of evidence on a highly relevant factual point. So too is his opinion that Viamedia cannot make a competitive offer for ad rep services if Comcast conditions its competitor MVPDs' Interconnect access on forgoing Viamedia's services. He drew on his expertise to make these two determinations, both of which required analysis of market conditions. These opinions informed his broader opinion that Comcast's exclusion of Viamedia from the Interconnects was integral to its tying conduct. The district court therefore abused its discretion in concluding that Dr. Furchtgott-Roth's testimony was not significantly informed by his expertise. It was, and it therefore meets the requirement of Federal Rule of Evidence 702(a).

### 3. *Lack of Expert Witness on Causation*

Comcast also argues that Viamedia's case must fail because it has not offered an expert on causation. Hiring another expert on causation is not a legal requirement for successfully bringing an antitrust case. Rather than requiring "§ 2 liability [to] turn on a plaintiff's ability or inability to reconstruct the

hypothetical marketplace absent a defendant's anticompetitive conduct," which "would only encourage monopolists to take more and earlier competitive action," courts have inferred causation when a defendant's conduct "reasonably appear[s] capable of making a significant contribution to … maintaining monopoly power." *United States v. Microsoft Corp.*, 253 F.3d 34, 78–79 (D.C. Cir. 2001) (en banc) (citation omitted). To the extent there may be an underlying problem of proof, "the defendant is made to suffer the uncertain consequences of its own undesirable conduct," and causation "queries go to questions of remedy, not liability." *Id.* at 79–80 (citation omitted).

## *Conclusion*

Viamedia alleged sufficiently, and at summary judgment offered sufficient evidence, that Comcast violated Section 2 of the Sherman Act. Viewing the allegations and evidence in the light most favorable to Viamedia, Comcast abruptly terminated decade-long, profitable agreements and sacrificed short-term profits to obtain and entrench long-term market power, and used its monopoly power in Interconnect services market to force its MVPD competitors into a relationship that makes Comcast a gatekeeper of its competitors' advertising revenue. This conduct "reveal[s] a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409, discussing *Aspen Skiing*, 472 U.S. 585. Comcast is free to contest these issues at trial, as well as to try to prove and quantify any procompetitive justifications. The factual disputes in this case are numerous, genuine, and material. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part. The majority opinion is synoptic in its coverage, deeply researched, and meticulous in its consideration of the antitrust issues this case presents. It deserves much respect. While I agree Viamedia has plausibly alleged an antitrust violation and is entitled to reversal and remand on its refusal-to-deal claim, I would affirm summary judgment on its tying claim because the undisputed facts do not present evidence of an illegal tie. I also respectfully part company with my colleagues on some other issues the majority opinion tackles.

The last several decades have brought a new regime to antitrust law in the world of exclusionary conduct. Outdated monopolization doctrines have given way to a sharper and narrower understanding of what constitutes exclusionary behavior under § 2 of the Sherman Act, 15 U.S.C. § 2. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001). History teaches this new regime promotes competition and innovation in the marketplace, and it informs the resolution of the claims and defenses before us now.

## I.   Refusal to Deal

A 2003 agreement between Viamedia and Comcast granted Comcast the exclusive right to sell on its Chicago, Detroit, and Hartford Interconnects advertising availabilities that Viamedia purchased from multichannel video programming distributors ("MVPD") WOW! and RCN. Viamedia understood that, upon the agreement's expiration, Comcast had the right to solicit RCN's and WOW!'s advertising business directly. The agreement between Viamedia and Comcast ex-

pired May 31, 2012. The next day Comcast informed Viamedia of its intent not to renew their agreement and to seek RCN's and WOW!'s business directly.

Comcast "prefers to deal directly with MVPDs, rather than with intermediaries such as Viamedia, and has found substantial benefits from direct dealings." Appellee's Br. 11. When their contracts with Viamedia expired in 2015, RCN and WOW! contracted with Comcast to be their ad representative in Chicago and Detroit and sell their availabilities on its Interconnects. Up to that point, Viamedia's agreements with RCN and WOW! prevented them from dealing directly with Comcast.

Cut out of the deal, Viamedia sued Comcast for allegedly violating § 2 of the Sherman Act, claiming Comcast's decision to end Viamedia's access to the Interconnects lacked a valid business reason under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). Specifically, Viamedia alleged Comcast's decision caused Comcast to forfeit fees upfront and reduced the economic value of the Interconnects. The allegations do not claim that Comcast's sacrificed profits later led to monopoly recoupment.

The district court dismissed Viamedia's refusal-to-deal claim. *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674 (N.D. Ill. 2016). The court found that Viamedia's own allegations admitted a valid business purpose for Comcast's refusal: removing an intermediary, Viamedia, to deal directly with MVPD customers.[1] *Id.* at 698. The court further found that Viamedia

---

[1] This court has characterized this common business practice of vertical integration or disintermediation as pro-competitive and efficient. *See*

failed to allege or explain how Comcast's refusal to deal with it had "no rational procompetitive purpose." *Id*.

## A. *The Refusal-to-Deal Claim Survives a Motion to Dismiss.*

We review the grant of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss de novo and ask whether there is "plausibility in the complaint." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007)) (internal citations omitted); *see also Deppe v. NCAA*, 893 F.3d 498, 500 (7th Cir. 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not ask whether the allegations are likely true; the court must assume they are. Instead, the inquiry is "whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief." *Christy Sports*, 555 F.3d at 1191–92. The plaintiff must plausibly allege more than "wholly conclusory statements" that a defendant violated § 2 of the Sherman Act to advance past the pleadings stage. *Id*.

In considering the alleged violation at the root of Viamedia's refusal-to-deal claim, we must be cognizant that "the antitrust laws rarely impose on firms—even dominant firms—a duty to deal with rivals." *Novell*, 731 F.3d at 1066; *see also Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398,

---

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984) (holding "vertical integration usually is procompetitive").

411 (2004) (holding even a monopolist has no duty to cooperate with rivals). "As a general rule purely unilateral conduct does not run afoul of section 2—businesses are free to choose whether or not to do business with others and free to assign what prices they hope to secure for their own products." 731 F.3d at 1072. In the past, "some courts suggested that a monopolist must lend smaller rivals a helping hand," but today it is understood that forcing rivals to cooperate "usually leaves consumers paying more for less." *Id.*; *see also* Frank H. Easterbrook, *The Chicago School & Exclusionary Conduct*, 31 HARV. J.L. & PUB. POL'Y 439, 441–42 (2008) (antitrust themes incentivizing cooperation among firms largely "bit the dust in *Verizon v. Trinko*" and now "the main goal of antitrust is to compel firms to be rivals"); *Olympia Equip. Leasing v. Western Union Telegraph*, 797 F.2d 370, 375 (7th Cir. 1986) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches.").

Despite this hesitancy to condemn refusals to deal, a monopolist's behavior violates § 2 if it is "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075; *see also* 3 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 651b3, p. 107 (4th ed. 2015) (monopolizing conduct is "irrational" if "only explanation that makes it seem profitable is destruction or discipline of rivals") (hereinafter Areeda & Hovenkamp, ANTITRUST LAW); *Trinko*, 540 U.S. at 407 (defendant must be seeking "an anticompetitive end"); *Aspen Skiing*, 472 U.S. at 605 ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory.") (internal citations omitted); *Christy*

*Sports*, 555 F.3d at 1194 ("in rare circumstances a refusal to co-operate with competitors might constitute a § 2 violation").

It is unclear—particularly on a motion to dismiss when a plausibly alleged violation is all that is required—whether conduct "irrational but for its anticompetitive effect" is to be treated the same as conduct with "no rational procompetitive purpose." *See* 218 F. Supp. 3d at 698. Although slight, there is a difference: the former provides an antitrust plaintiff the opportunity to argue that, despite some efficiency justification proffered by an antitrust defendant, the rational or intended goal of the conduct was its anticompetitive impact. The latter, in contrast, requires the antitrust defendant to put forward any evidence of some business reason for its conduct, regardless of potential anticompetitive effect. The district court applied the latter and found there was a rational procompetitive purpose because Comcast offered evidence of vertical integration and disintermediation—motives that I agree reflect lawful and procompetitive marketplace conduct.[2] But it did so by disregarding the plausibility of Viamedia's allegations of anticompetitive conduct and weighing the evidence in Comcast's favor. This is not the court's role on a Rule 12(b)(6) motion.

Any confusion here may stem from a misunderstanding of how to handle conflicting evidence of conduct in the allegations. If only one party advances evidence showing procompetitive or anticompetitive conduct, the court may find

---

[2] The majority opinion reviews vertical integration and disintermediation cases cited by Comcast and concludes they are inapposite here on the question of procompetitive conduct. *See* Majority op. at pp. 63–67. While it does not change my agreement with the majority to remand the refusal-to-deal claim, I do not reach this same conclusion.

the lack of any opposing evidence shows either rationality or irrationality for § 2 purposes. *See Novell*, 731 F.3d at 1076 (on review of judgment as a matter of law, finding no evidence from which a reasonable jury could conclude monopolist's conduct was irrational); *see also Aspen Skiing*, 472 U.S. at 610 (on review of summary judgment, finding no evidence of efficiency justification for the refusal to deal). But even these instances are post-pleading. What of the parties who, at the pleading stage, proffer allegations of competing economic justifications for behavior? Are we to accept the defendant's proffered justification as conclusive of procompetitive rationality without considering the plaintiff's allegations of anticompetitive conduct? If so, can an antitrust plaintiff ever advance past the pleadings stage when a defendant asserts a procompetitive justification? The district court effectively held the plaintiff cannot, 218 F. Supp. 3d at 698, but this is up for debate. *See* 3 Areeda & Hovenkamp, ANTITRUST LAW ¶ 651b3, pp. 106–07 (criticizing approach that relies on facts which "benefit the defendant very slightly while doing considerable harm to the rest of the economy;" "[n]ot all monopolizing conduct that we might wish to condemn is 'irrational'"); *Microsoft Corp.*, 253 F.3d at 59 (defendant bears the burden of presenting a "nonpretextual claim" and proving procompetitive justification on the facts); *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1481–82 (7th Cir. 1991) (finding "the presence of a legitimate business justification *reduces the likelihood* that the conduct will produce undesirable effects on the competitive process"; "[w]hether valid business reasons motivated a monopolist's conduct is a question of fact" for a fact-finder); *Olympia*, 797 F.2d at 378 (reasoning the lack of "a clear business justification" among conflicting evidence "*may indicate* probable anticompetitive

effect" but is not conclusive). We need not settle this debate, though, as it does not impact the decision to remand.

As the majority opinion recognizes, "the calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard." Majority op. at p. 59. Viamedia alleged Comcast's conduct could achieve "no pro-competitive justifications" because there were no "problems in allowing Viamedia to participate in Interconnects" on behalf of its MVPD customers. Viamedia's allegations show more than market power; they allege Comcast's exclusionary conduct was anticompetitive and harmful to the economic purpose of the Interconnects, *see Christy Sports*, 555 F.3d at 1192 (anticompetitive allegation must appear in the pleadings), specifically by denying Viamedia access to the Interconnects. Giving Viamedia the benefit of its allegations, its refusal-to-deal claim clears the Rule 12(b)(6) pleading bar because it plausibly alleges it was "excluded from the market and injured by defendant['s] actions," *Tri-Gen Inc. v. Int'l Un. of Op. Eng's Local 150*, 433 F.3d 1024, 1032 (7th Cir. 2006)—an alleged injury that "harms both competitors *and* competition," *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 118 (1986). Down the road, the facts Viamedia has pleaded or other facts discovered may render its refusal-to-deal claim a candidate for summary disposition. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir. 1988) (considering various antitrust claims: "the very nature of antitrust litigation encourages summary disposition of such cases when permissible"). But viewing the facts in a light favorable to Viamedia, its refusal-to-deal claim has not reached that point.

On a motion to dismiss, an antitrust plaintiff seeking § 2 damages must point to plausible allegations showing its rival's refusal to deal was irrational but for its anticompetitive effect. Regardless of how this court in the future resolves competing justifications at the dismissal stage, Viamedia has plausibly alleged refusal to deal in violation of § 2 and was entitled to advance that claim beyond the pleadings.

**B.** *The Refusal-to-Deal Claim Is Different than the Claim in* **Aspen Skiing.**

The majority opinion concludes this case is indistinguishable from *Aspen Skiing*, 472 U.S. 585. Majority op. at p. 54. I respectfully do not join the majority's conclusion that *Aspen Skiing* "maps onto Comcast's conduct," *id.* at 44, or that on a refusal-to-deal theory this case "appears stronger than *Aspen Skiing*." *Id.* at 52.

The familiar holding of *Aspen Skiing* is that the defendant's "failure to offer any efficiency justification whatever for its pattern of conduct" resulted in a § 2 violation. 472 U.S. at 608; *see also Christy Sports*, 555 F.3d at 1197 (finding the "critical fact in *Aspen Skiing* was that there were no valid business reasons for the refusal" to deal). Its holding is specific: the defendant could not justify either its insistence on breaking up the joint lift pass or its refusal to sell the other owner its passes for the same value just to keep the pass together. 472 U.S. at 603. There was no efficiency reason offered for the defendant's conduct; the only apparent purpose was to eliminate competition. *Id.* at 608. The Supreme Court later explained that this conduct constituted a violation because the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*,

540 U.S. at 409. The defendant's "unwillingness to renew the ticket even if compensated at retail price revealed a distinctly anticompetitive bent." *Id; see also Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000) (explaining the decision "to forgo cash revenues and efficient methods of doing business for the sole purpose of driving its rival out of the market" is a § 2 violation).

The application of *Aspen Skiing*'s holding has been the subject of substantial debate. Albeit a seminal antitrust opinion, *Aspen Skiing* is recognized as a factual and legal exception under current antitrust law. *See Trinko*, 540 U.S. at 409 ("*Aspen Skiing* is at or near the outer boundary of § 2 liability."). Today, it fits within the "narrow world of refusal to deal cases."[3] *Novell*, 731 F.3d at 1079; *see* Easterbrook, *The Chicago School & Exclusionary Conduct*, at 441–42 (describing the Court's holding in *Aspen Skiing* as "the last gasp of the old school of antitrust").

Not all refusal-to-deal challenges fall within the "limited exception" of *Aspen Skiing*. *Novell*, 731 F.3d at 1074–75. To invoke that exception, there must be a preexisting, voluntary, and presumably profitable course of dealing between a monopolist and a rival, and the discontinuation of that dealing must reveal irrational willingness to forsake short-term

---

[3] *See* Gov't's Br. in Supp. of Neither Party at 6, 8–11, ECF No. 33 (arguing only limited circumstances have been recognized in which a monopolist violates § 2 by refusing to deal with a rival, and those circumstances are tightly circumscribed due to the negatives of coerced dealing; recommending this court follow *Novell* and its test that a refusal to deal does not violate § 2 "unless it would make no economic sense for the defendant but for its tendency to eliminate or lessen competition").

profits to achieve an anti-competitive end. *Id*. Evidence of for-saking short-term profits may "isolate conduct that has *no* possible efficiency justification." *Id.* at 1077. When consider-ing sacrificed profits, though, courts should not "disaggregate profits from different lines of business" as "[p]arsing profits" would defeat the purpose of "holding firms liable for making moves that enhance their overall efficiency." *Id.* (disaggregat-ing profits would make it difficult to assess firm's goal of "maximizing overall profits" and is inconsistent with the Court's reasoning in *Aspen Skiing* and *Trinko*); *see also Christy Sports*, 555 F.3d at 1194 (businesses have ability "to recoup [their] investment[s]" in any number of ways). In finding the *Aspen Skiing* exception applies here, the majority opinion points to three key factors underlying the Supreme Court's decision in that case: (1) an important change in a pattern of distribution that had persisted for years; (2) conduct in the market with arrangements in comparable markets; and (3) forgoing profitable transactions. Majority op. at pp. 49–51. On these factors, I see *Aspen Skiing* and this case as different.

First, in *Aspen Skiing* there was more than an "important change" in the distribution pattern, as in that case the joint pass was terminated altogether. 472 U.S. at 603. Here, no termination of the Interconnect occurred; instead, Comcast encouraged additional MVPD participation and sought to se-cure their access to the Interconnects by contracting with them directly. Second, in *Aspen Skiing*, the monopolist's con-duct in comparable markets where it lacked dominance in-cluded the use of cooperative tickets in areas that apparently were competitive. *Id.* at 603–04. But Comcast participates in Interconnects across other DMAs, and, where it is the largest MVPD in a market, it operates the Interconnect there, too. 335

F. Supp. 3d at 1046. Third, in *Aspen Skiing* the forgoing of profitable transactions was not alone, but "in exchange for perceived long-run impact on its smaller rival," and referenced in *Aspen Skiing* only in the context of finding no efficiency justification for the refusal to deal. 472 U.S. at 608, 610. That is not the case here, as Comcast was able to proffer an efficiency justification (disintermediation and vertical integration) for its conduct. *See* Appellee's Br. 3.

*Aspen Skiing* would be more analogous to this case if a third-party vendor had managed the sales and advertising of the joint pass directly to skiers, and then Aspen Skiing Company (the monopolist) took over that role for vertical integration or other efficiency reasons. Instead, Aspen Skiing Company terminated the joint pass altogether; that would be like Comcast terminating the Interconnects to create a sub-optimal new platform to sell advertising, which of course did not happen here. Rather than terminate the Interconnects, Comcast encouraged MVPD participation and sought to secure MVPDs' access to the Interconnects by contracting directly with them. The record also contains evidence that Comcast acted pursuant to a rational business purpose: Comcast claimed it sought vertical integration and disintermediation, and Viamedia admitted such an efficiency justification in its allegations. *See id.* at 3.

Still, the reinstatement of Viamedia's refusal-to-deal claim does not depend on *Aspen Skiing*. Because that claim survives the plausibility requirement we apply under Rule 12(b)(6), that portion of the judgment should be reversed and remanded.

**C.** *Opinion Testimony on the Refusal-to-Deal Claim May Be Allowed.*

Lastly on the refusal-to-deal claim, the district court's order regarding expert witnesses, which we review for abuse of discretion, is properly vacated. *See Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998). On remand, the landscape of this case will have sufficiently changed to allow for this method of proof on the refusal-to-deal claim. This reversal allows for Viamedia to name expert witnesses on this claim, subject to the usual later motion practice to exclude or limit their testimony on this cause of action.

## II. Tying

After their agreements with Viamedia expired, RCN and WOW! sought exclusive, full-turnkey relationships with Comcast. Neither RCN nor WOW! ever sought Interconnect-only services. The record contains no evidence that Comcast has ever declined an MVPD's request for Interconnect-only services; in fact, 14 percent of Comcast's agreements with MVPDs across all DMAs since December 2011 were Interconnect-only agreements. *Viamedia, Inc. v. Comcast Corp.*, 335 F. Supp. 3d 1036, 1058 (N.D. Ill. 2018). None of those Interconnect-only agreements prevent an MVPD from hiring another ad representative for local sales or conducting their own ad representation.

Under its tying theory, Viamedia claimed Comcast conditioned access to the Interconnect (the "tying" product) on the purchase of Comcast's ad representation services (the "tied" product). But for whom? Viamedia conceded that both RCN and WOW! maintained the ability to deal directly with Com-

cast and access the Interconnect without any ad representative should they choose not to employ Comcast at the termination of their agreements with Viamedia.

The district court granted summary judgment on Viamedia's tying claim. 335 F. Supp. 3d at 1074. In so doing the court found there was no evidence that Comcast conditioned access to the Interconnect on the purchase of ad representation services. *Id.* at 1058 (finding the fact that RCN and WOW! both requested full-turnkey representation and that 14 percent of Comcast's agreements with MVPDs are Interconnect-only "belies any inference that Comcast tied its services."). The court further found there was no triable issue as to antitrust injury or damages, both necessary elements of an actionable claim. Notably, Viamedia admitted its injuries were "fully attributable to Comcast's decision to deny Viamedia Interconnect access," *id.* at 1070, thereby failing to establish a cognizable antitrust injury separate from the refusal to deal. Viamedia likewise failed to separately prove damages caused by the alleged tying conduct, again collapsing that showing into the refusal-to-deal claim. *Id.* at 1072–73.

To the district court, the crux of Viamedia's tying claim was that Comcast withheld the alleged tying product from its *rival*, Viamedia, not from its *customers*, WOW! and RCN. As the court found, Viamedia aimed to sell MVPDs a bundle of Comcast's Interconnect services with Viamedia's ad representation services, but "Viamedia has no antitrust right to force Comcast to help it sell such a bundle to their mutual customers." *Id.* at 1064. Finding the undisputed evidence did not show tying conduct, the district court granted summary judgment. *Id.* at 1074.

**A.** *Antitrust Injury and Standing are Lacking on the Tying Claim.*

As a threshold matter, a plaintiff must have antitrust standing to bring an antitrust claim. *See McGarry & McGarry v. Bankr. Man. Solut.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (antitrust standing required to identify "which plaintiffs may bring the cause of action"); *see also Novell*, 731 F.3d at 1080 ("[A] private party must establish some link between the defendant's alleged anticompetitive conduct, on the one hand, and its injuries and the consumer's, on the other."). A showing of antitrust standing requires more than the standing inquiry under Article III. *See McGarry*, 937 F.3d at 1063 ("[T]he Sherman Act has additional rules for determining whether the plaintiff is the proper party to bring a private antitrust action.") (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)); *see also Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) ("Antitrust standing requires more than the 'injury in fact' and the 'case or controversy' required by Article III of the Constitution.").

To establish antitrust standing, a plaintiff must first show it was injured by anticompetitive conduct. *See McGarry*, 937 F.3d at 1063–64. Antitrust standing is limited to "(1) those who have suffered the type of injury that the antitrust laws were intended to prevent and (2) those whose injuries are a result of the defendant's unlawful conduct." *Id.* (quoting *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1995)); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

489 (1977) (antitrust plaintiff must be able to show that its injury is "of the type the antitrust laws were intended to prevent").

Even if a plaintiff can show its injuries are the result of unlawful anticompetitive conduct, it must be able to "efficiently vindicate the purposes of the antitrust laws" to gain antitrust standing. *Kochert*, 463 F.3d at 716; *see also Associated Gen. Contractors*, 459 U.S. at 537–44 (plaintiff's ability to efficiently vindicate the law's purpose confers antitrust standing if shown antitrust injury); *In re Industrial Gas Antitrust Litig.*, 681 F.2d 514, 526 (7th Cir. 1982) ("not all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue"). Simply, the successful antitrust plaintiff must prove both antitrust injury and antitrust standing. *See Kochert*, 463 F.3d at 716.

"We usually presume that competitors and consumers in the relevant market are the only parties who suffer antitrust injuries and are in a position to efficiently vindicate the antitrust laws." *McGarry*, 937 F.3d at 1065 (citing *Associated Gen. Contractors*, 459 U.S. at 538; *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016)). "But 'presumptively' does not mean always," *SAS of Puerto Rico v. Puerto Rico Telephone Co.*, 48 F.3d 39, 45 (1st Cir. 1995) (finding third-party suppliers are not "automatically improper antitrust plaintiffs"), and often consumers or competitors are denied antitrust standing.

The majority opinion proffers a bright-line rule "that customers and competitors in the affected market have antitrust standing," Majority op. at p. 99. But in each case cited in the majority opinion the court denied antitrust standing, including to competitors. *See Kochert*, 463 F.3d at 718; *Tri-Gen Inc. v.*

*Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1031–32 (7th Cir. 2006); *Brunswick*, 429 U.S. at 477–78, 484, 488 (collectively, competitors); *see also McGarry*, 937 F.3d at 1063–66; *In re Aluminum*, 833 F.3d at 158; *Serfecz*, 67 F.3d at 597–98; *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999); *SAS of P.R., Inc.*, 48 F.3d at 44; *Associated Gen. Contractors*, 459 U.S. at 540 (collectively, neither consumers nor competitors).

Instead, on this prerequisite the relevant case law prioritizes the type, directness, and cause of an antitrust injury, rather than applying a bright-line rule for antitrust standing based on the plaintiff's status. *See McGarry*, 937 F.3d at 1064–65 (examining the "type of injury" alleged, the "remote[ness]" or "direct link" between the alleged antitrust violation and the claimed antitrust injury, and the "causal connection") (citing *Associated Gen. Contractors*, 459 U.S. at 537–40 (explaining these factors)); *see, e.g., Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 (1982) (plaintiff's status was neither consumer nor competitor, but granted antitrust standing based on type, directness, and cause of antitrust injury suffered).

Even with the presumption favoring consumers and competitors, standing is granted to rivals only when it "serves antitrust policy." 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. 232 (4th ed. 2014) (examples include when a rival is in a position to detect a violation earlier than consumers, or the rival's injury is large while consumers' injuries are small or their suits less likely). "[T]he elimination of a single competitor, standing alone, does not prove anticompetitive effect." *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) (quoting *Kaplan v. Buroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979)). Thus, it is uncommon that a suit by a single foreclosed

rival disputing a tying arrangement will have antitrust standing.[4] *See* 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. 232 ("courts are properly skeptical of many rivals' suits, particularly when the practices are not obviously 'exclusionary'"). First, the rival must show it suffered the type of injury the antitrust laws intend to prevent. This is consistent with antitrust jurisprudence that looks to market injury, like raised prices and decreased output or quality, to determine a competitor's antitrust injury. *See Tri-Gen*, 433 F.3d at 1031 ("To have standing as a competitor, [plaintiff] needed to show that 'its loss comes from acts that reduce output or raise prices to consumers.'") (quoting *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)); *see also Serfecz*, 67 F.3d at 597 (plaintiff's injury was "linked to the injury inflicted upon the market," including consumers paying higher prices); *Associated Gen. Contractors*, 459 U.S. at 539 n.40 (finding no antitrust injury from alleged predatory behavior because competitor failed to show "that output has been curtailed or prices enhanced throughout an entire competitive market").

Next, the rival must show it is the party "who can most efficiently vindicate the purposes of the antitrust laws"

---

[4] The leading treatise acknowledges the possibility that a rival could have standing if an illegal tying arrangement creates, enlarges, or perpetuates a monopoly for a tied product, and that rival may be foreclosed if it loses existing market share or sales. But "[i]njury to the foreclosed rival occurs, of course, only because a tie has forced buyers to purchase the defendant's tied product rather than the rival's." 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1767a, p. 449. This is a high bar: the rival must show (a) a monopoly in the tied-market, (b) the loss of its existing market share or sales (not limited to certain customers), and (c) an injury based only on buyers being forced to purchase defendant's product over their own.

against unlawful ties. *Kochert*, 463 F.3d at 718 (quoting *Serfecz*, 67 F.3d at 598). But, having been forced to purchase a product it did not want, the tied consumer is almost always in the superior position to sue the violator. *McGarry*, 937 F.3d at 1066 (concluding "[t]here is, after all, a more appropriate person to pursue [a] claim" when that person's "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"); *see also Kochert*, 463 F.3d at 718; 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. 232 (recognizing that "consumers almost always have the correct incentives for suit, [but] rivals do not"). The presence of a more appropriate person to bring a claim "diminishes the justification for allowing a more remote party" to step in. *McGarry*, 937 F.3d at 1066 (quoting *Associated Gen. Contractors*, 459 U.S. at 542). Whether or not there is a more appropriate plaintiff, a rival may not pursue an antitrust injury that is "entirely derivative" of other injuries. *Id.* And even when standing is recognized, a foreclosed rival cannot oppose efficient, legitimate, or even aggressive lawful competition by its rivals. 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. at 231 ("[A] rival may allege an antitrust violation by its rivals not to protect competition but to protect itself from competition. … Such losses are not antitrust injury, so the rival is [] denied standing.").

Here, Viamedia claims it is a foreclosed rival harmed by Comcast's alleged tying conduct. First, Viamedia must show it suffered an injury the antitrust laws intend to prevent that is directly linked to or caused by Comcast's alleged tying conduct. But Viamedia relies on the injuries and damages it claims from Comcast's refusal to deal rather than any distinct tying injury. *See* 335 F. Supp. 3d at 1069–73 (Viamedia's expert testified that foreclosure from the market and resulting injury

or damages "flows directly from Viamedia's inability to access" the Interconnects, not tying); *see also Novell*, 731 F.3d at 1080 (declining to recognize separate, cognizable antitrust injury for other exclusionary conduct that relied on alleged refusal-to-deal injury). Viamedia has conceded that any injury it suffered is derivative of Comcast's refusal to deal, not the alleged tie. So Viamedia lacks an independent basis for advancing a tying claim, and recognizing it as a foreclosed rival with standing to sue under the narrow exception described above would not "serve[] antitrust policy." 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. 232. While Comcast offered its customers, RCN and WOW!, access to the Interconnect and exclusive ad representation services, it was not required to make such an offer to its rival, Viamedia. This reveals the fatal flaw in Viamedia's tying theory: even if Comcast acted precisely as Viamedia claims by tying Interconnect access and ad representation services, Viamedia would suffer no separate, cognizable antitrust injury. 335 F. Supp. 3d at 1071; *see Novell*, 731 F.3d at 1080 ("Even if Microsoft had behaved just as Novell says it should have, it would have helped Novell not at all.").

Next, Viamedia must show it is the party "who can most efficiently vindicate the antitrust laws" regarding tying. *Kochert*, 463 F.3d at 718 (quoting *Serfecz*, 67 F.3d at 598). While Viamedia enjoys the general presumption of antitrust standing as a competitor, this presumption is limited by the court's determination of whether an antitrust injury occurred. *See* 2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 348a, p. 232. Here, RCN and WOW! would have been directly impacted by Comcast's alleged tying conduct and would be in the superior position to pursue a claim against Comcast. Viamedia could not participate directly in this alleged tying arrangement, and it

now seems motivated to protect itself from competition rather than enforce the antitrust laws. *See* Majority op. at p. 66 ("Viamedia simply wants to ensure that MVPDs can freely choose Viamedia as their supplier of ad rep services if that is their preferred choice.").[5]

Because Viamedia has not shown a cognizable injury that the antitrust laws intend to prevent or that was directly linked to an antitrust violation caused by Comcast's conduct, it has no antitrust injury. Without an antitrust injury, and not able to efficiently enforce the law against illegal tying, Viamedia lacks antitrust standing to bring this claim.

### B. *Summary Judgment Was Properly Granted on the Tying Claim.*

The district court's grant of summary judgment on Viamedia's tying claim, which we review de novo, was proper. We construe all facts and reasonable inferences in favor of the nonmoving party, and we refrain from weighing any evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 655 (7th Cir. 2002) (describing the

---

[5] Even if somehow Viamedia could be considered a foreclosed rival with antitrust injury and standing, the leading treatise notes the possibility of injunctive relief—which the district court correctly concluded was misplaced on these facts, 335 F. Supp. 3d at 1074—and that treatise observes how difficult it is in such a circumstance to prove damages without speculation. 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1767a, p. 450 ("Even for those established in the market, estimating the number of sales lost as a result of the tying arrangement is elusive at best.").

Viamedia's status as a foreclosed rival, though, would depend on the existence of a tie. I conclude below the undisputed facts show no evidence of tying conduct because there was no conditioned sale of services.

weighing of evidence as a "trap" to avoid). But the nonmoving party must "go beyond the pleadings" at summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). It must affirmatively demonstrate through evidence that there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Liability under § 2 requires anticompetitive conduct. *Mercatus Grp.*, 641 F.3d at 854; *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). On summary judgment, the § 2 plaintiff must present evidence tending to exclude the possibility that the monopolist's conduct is as likely to be pro-competitive as anticompetitive. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986) ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy"); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984) ("[T]here must be evidence that tends to exclude the possibility of independent [pro-competitive] action by the manufacturer and distributor.").

As noted previously, firms—even monopolies—generally have the right to decide with whom they will do business. In this vein, "antitrust law does not require monopolists to co-operate with rivals by selling them products that would help the rivals to compete." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006); *see Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 450 (2009) (monopolist may wield "upstream" power "to prevent rival firms from competing effectively" in a downstream market); *see also Trinko*, 540 U.S. at 409–10 (a monopolist has no duty to deal with a rival, let alone a duty to deal on favorable terms). In presenting its tying claim, though, Viamedia argued that Comcast's conduct constituted more than a "mere" refusal to deal. 335 F. Supp. 3d at 1057.

Viamedia claimed that when Comcast excluded Viamedia from the Interconnects, Comcast engaged in the "distinct" practice of tying, pressing forward with this claim as an "alternative theor[y]" of relief. *Id.* After discovery on Viamedia's tying theory, the district court ruled that "the record leaves no genuine issue of material fact." *Id.* The district court correctly evaluated Viamedia's tying claim and rightly concluded that Viamedia's proffered evidence did not tend to exclude the possibility that Comcast's alleged tying conduct was as likely procompetitive as anticompetitive. *Id*. at 1055–64.

Under the new antitrust regime, "[o]utright condemnation of product tying has been reversed." Hon. Richard D. Cudahy & Alan Devlin, *Anticompetitive Effect*, 95 MINN. L. REV. 59, 76 (2010); *see Microsoft Corp.*, 253 F.3d at 49 ("[N]ot all ties are bad."). The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). An illegal tie, whether express or as applied, exists only when "the defendant improperly imposes *conditions* that explicitly or practically require buyers to take the second product if they want the first one." 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1752b, p. 291 (4th ed. 2018). The fundamental feature of a tying claim is the conditioned sale, including by force. *See Sheridan v. Marathon Petrol. Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008). No conditioning occurs if a buyer wants to purchase a bundle of the tied and tying products from the same seller. *See Will v. Comprehensive Acct. Corp.*, 776 F.2d 665, 669 (7th Cir. 1985) ("A tie within the meaning of antitrust depends on showing that the buyer did *not* want to take both products

from the same vendor."). Without the actual, conditioned sale of the tied product, there is no tie. *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016) ("If ... the buyer is free to decline the tied product ..., then by definition there is no unlawful tying.").

Other circuits have acknowledged the essential and indispensable role conditioning plays in a tying claim. In *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016),[6]

---

[6] The majority opinion relies on certain factual assumptions to attempt to distinguish *Aerotec*.

First, the majority assumes "this is not a typical bundling case," Majority op. at 77, so *Aerotec* should not control. But *Aerotec* provides an instructive framework for determining whether a tie has occurred and illustrates the important role that conditioning plays in an unlawful tying arrangement, *see* 836 F.3d at 1179.

Second, the majority assumes "self-providing ad rep services was not a viable option for RCN and WOW!," Majority op. at 78, and so they "needed to employ [a third-party] ad rep services provider." *Id.* at 77 n.17. As discussed elsewhere in this opinion, infra at 28–29, this assumption relies on the majority opinion's conclusion that it must not have been economically feasible for RCN and WOW! to internalize ad representation, either regionally or locally. This is not supported by the record, which contains undisputed evidence of various economically feasible options MVPDs choose in structuring their advertising sales. *See* infra at 25–26. Regardless, this assumption does not prevent Aerotec's application here.

Third, the majority assumes RCN and WOW! had "no choice but to obtain ad rep services from Comcast," Majority op. at 34 n.8, and were "forced by Comcast" to do so. *Id.* at 77 n.17. This in turn assumes that RCN and WOW! did not want ad representation services from Comcast. But the evidence shows the opposite: neither RCN nor WOW! ever requested Interconnect-only services from Comcast, and both sought full-turnkey relationships with Comcast to receive ad representation and Interconnect services together. Ultimately, Comcast's and Viamedia's offers to solicit RCN's and WOW!'s business were "nowhere near equal," and it was "not a very difficult decision" for the MVPDs to make. 335 F. Supp. 3d at 1048.

the Ninth Circuit concluded there was no evidence that Honeywell, a monopolist manufacturer of replacement airplane parts, "explicitly or implicitly tie[d] or condition[ed] the sale" of replacement parts on a requirement that its customers use its in-house repair services. *Id.* at 1179. When Honeywell ceased supplying parts to Aerotec—a third-party repair service provider—for repairs, Aerotec sued Honeywell for alleged unlawful tying. *Id.* at 1177. Honeywell explained it had long preferred the benefits it achieved from internalizing its repair services and working with its affiliated servicers, rather than with independent ones like Aerotec. *Id.* at 1176–77. The court found it did not matter whether Honeywell had refused to deal with Aerotec, even if that made it more difficult for Aerotec to compete. *Id.* at 1179–80. The Ninth Circuit "decline[d] to stretch the tying construct to accommodate the claim that … conduct toward third party servicers … acts as an effective, or 'de facto,'" tying condition. *Id.* at 1178.

In *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992), the Fourth Circuit reached the same conclusion, finding there was no conditioned sale of a licensed product when customers demanded access to it, even though this hindered the ability of third-party servicers to compete with the company. *Id.* at 687–88. The same is true with the D.C. Circuit, *see Microsoft Corp.*, 253 F.3d at 85 (tying requires consumer to have "no choice but to purchase the tied product"), and this court, *see Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d

---

Comcast was able to offer superior terms and better prices with full Interconnect access and ad representation services. The assumption that any MVPD was forced or threatened to purchase ad representation services to gain access to the Interconnects does not follow from the evidence and is not a distinguishing factor from *Aerotec*.

312, 318 (7th Cir. 2006) ("conditioning access" to a service based on the forced purchase of a membership was essential element of tying).

Like these other third-party rivals, Viamedia has offered no evidence of conditioning. Such evidence is simply absent from the undisputed facts on which Viamedia attempted to build its tying claim:

- An ad representative is responsible for managing and selling an MVPD's avails to advertisers and can represent their MVPD customers: (1) locally, selling only a part of an MVPD's avails in a DMA to local advertisers; (2) regionally, selling all of the MVPD's avails in a DMA; or (3) nationally. *Id.* at 1044.

- The industry standard relationship between an ad representative and an MVPD is exclusive, region-wide, full-turnkey representation. *Id.* at 1045.

- MVPDs in a full-turnkey relationship with an ad representative have an exclusive agreement with that ad representative, which makes Interconnect services available to them without requiring a direct relationship with the Interconnect operator. *Id.* at 1063–64.

- Interconnect operators may pursue a direct relationship with MVPDs to sell a portion of their avails regionally without a third-party ad representative. *Id.* at 1046. This is called an "Interconnect-only" agreement. *Id.*

- Some MVPDs retain a portion of their avails for local advertising and hire an ad representative to represent them locally. *Id.* at 1045.

- Some MVPDs choose to conduct their own ad representation—regionally, locally, or both. *Id.*

- RCN and WOW! are MVPD customers of Comcast and Viamedia, which compete for MVPDs' business on the relevant Interconnects. *Id*. at 1046.

- Comcast refused to deal with Viamedia by disallowing it access to the relevant Interconnects. *Id*. at 1057.[7]

- No evidence shows that Comcast told MVPDs across all DMAs, expressly or impliedly, that they could only access the Interconnects on the condition that they also purchase ad representative services. *Id*. at 1058.

- Fourteen percent of Comcast's agreements with MVPDs across all DMAs are Interconnect-only. *Id*.

- RCN and WOW! never requested Interconnect-only services from Comcast, and both pursued full-turnkey relationships with Comcast. *Id*. at 1059.

These facts do not show illegal tying conduct. Both parties stipulate that Comcast never denied an MVPD's request to access the Interconnect on a standalone basis. In fact, 14 percent

---

[7] The majority opinion casts Comcast's refusal to deal as a negative fact, noting that Comcast "conceded repeatedly" that it had done so. Majority op. at p. 76. It is undisputed that Comcast refused to deal with Viamedia; the question on remand is whether that refusal was anticompetitive, which Viamedia will have to prove. As discussed, refusals to deal are now not disfavored, and in fact the opposite—cooperation among rivals—is a red flag under antitrust law. *See* Easterbrook, *The Chicago School & Exclusionary Conduct*, at 442 ("cooperation is to be feared rather than welcomed").

of Comcast's agreements with MVPDs across all DMAs are Interconnect-only. *Id.* at 1058; *see, e.g., It's My Party*, 811 F.3d at 685 (14 percent of standalone, non-tied sales "exceed [] sufficiently" the minimum threshold required "to cast doubt on any allegation of tying"); *see also* 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1756b2, p. 334 ("10 percent unbundle[ed]" sales rebuts any "established or presumed inference of a tying condition"); *see also Novell*, 731 F.3d at 1077 (aggregating sales and profits across entire market to assess firm's "overall efficiency" and not singling out smaller market or product line). And there is no evidence Comcast withheld Interconnect access from MVPDs unless they also purchased ad representative services from Comcast. Instead, the evidence shows that RCN and WOW! sought a full-turnkey relationship with Comcast to receive access to the Interconnects and ad representation services as a bundle. They were neither forced to purchase ad representation services from Comcast nor denied access to the Interconnects unless they purchased ad representation from Comcast. Further, if they wished, they were free to contract with a third-party ad representative for local sales. Even while under exclusive contract with Viamedia, RCN and WOW! were not forced to purchase ad representation services from Comcast. Comcast never poached RCN or WOW! during that time to capture their business in the ad market, and RCN and WOW! could have chosen to forgo ad representation altogether at the conclusion of those exclusive contracts.

That Comcast did not affirmatively offer RCN or WOW! Interconnect-only access does not alter these facts. Courts need not assume antitrust laws require a business to offer its customer a less profitable or less efficient option than the one the customer seeks. Here, it is undisputed that RCN and

WOW! sought Interconnect access and ad representation services as a bundle in a full-turnkey relationship with Comcast. *See* 9 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1700i, p. 12 (4th ed. 2018) ("[F]inding two products does not mean that they are tied together. The franchisee may have preferred a 'turnkey' franchise and never asked for the" tying product "separately"); *see also Will*, 776 F.2d at 670 (the "voluntary purchase of two products together" is "not a tie at all"). The district court recognized, and correctly rejected, how broad a view of tying Viamedia attempts to advance. 335 F. Supp. 3d at 1059 ("the constraining of consumer choice is of course a feature of a tying arrangement … but there must still be an actual 'tie' of products or services").[8] Viewing the record in the light most favorable to Viamedia, the evidence reflects that WOW! and RCN wanted full-turnkey representation, and they were prepared to hire the company with the ability to deliver both Interconnect access and ad representation services. Here, that company was Comcast.

My colleagues in the majority conclude, at various points, that it was not economically feasible for RCN or WOW! to conduct their own ad representation. *See* Majority op. at p. 34 n.8 (finding RCN and WOW! "had always chosen to buy [ad representation] services from outside companies, suggesting that in-house was not an economically viable option"); *id.* at 77 n.17 (concluding sufficient evidence existed of a "forced" sale because "RCN and WOW! needed to employ [a third-party] ad rep services provider"); *id.* at 78 (deciding "self-providing ad rep services was not a viable option for RCN

---

[8] Further, if tying occurred, one would expect to see higher prices or lower output. *See* Washington Legal Foundation's Br. in Supp. of Def. at 12, ECF No. 45. There is no such evidence here.

and WOW!"); *id.* at 82 (finding evidence "showing that in-house provision of ad rep services simply was not a practical option for RCN or WOW! in these markets"). This conclusion assumes that if RCN and WOW! chose to outsource ad representation to a third-party, either locally or regionally, then it must have been economically feasible to do so. It also assumes the inverse: that internalizing these services must be economically *in*feasible. Such assumptions go beyond the court's role and presume underlying facts about the parties' business practices and strategies that we simply do not know and cannot accurately predict. These assumptions are not supported by the record, which instead contains evidence of various economically feasible options MVPDs choose in structuring their advertising sales, including internalizing part of or all ad representation services. 335 F. Supp. 3d at 1044. I respectfully do not share this economic feasibility conclusion and rely only on the evidence presented.

The majority opinion also references "[a]mple evidence" the jury could have relied upon to "easily find that Comcast improperly forced the smaller MVPDs to buy its ad rep services" through a tying arrangement. Majority op. at pp. 75–76. In particular, the majority points to internal Comcast and WOW! documents, deposition responses, and testimonies before the Federal Communications Commission and the Department of Justice. But the relevant evidence shows Comcast's desire to solicit RCN's and WOW!'s business directly, *not* the forced purchase of a service that neither RCN nor WOW! wanted. For example, the majority references an email from a WOW! employee to his colleagues explaining his understanding that "[WOW!] can be in the [Interconnect] but only if [Comcast] rep[s] us directly." *See* Majority op. at p. 75.

The majority opinion reads this as revealing Comcast's "demands" and "threats" with which RCN and WOW! did not "willingly" comply. *Id.* But in context, the email reflects only ongoing business negotiations between WOW! and Comcast, in which Comcast expressed its desire to no longer accommodate third-party ad representatives (its competitors) on the Interconnects it operates. This is consistent with Comcast's position all along—that it wishes to increase efficiency by internalizing services—and does not constitute tying as defined.

Some other examples: in a different email, a Comcast employee expressed to a WOW! employee Comcast's "desire to have a direct relationship" with MVPDs on the Interconnects and noted that "Comcast would be thrilled to do business directly with WOW," reiterating the "tremendous value and benefits [Comcast] can deliver for WOW" in a direct relationship. Another Comcast employee noted in a deposition that working "through a middleman" like Viamedia "really brought no value to the table" and the decision not to renew its contract with Viamedia was primarily to "have a direct relationship with WOW and RCN." Explaining RCN's decision to contract directly with Comcast, an RCN executive testified to the superior terms Comcast could provide, noting that Comcast's and Viamedia's offers were "nowhere near equal" and that it was "not a very difficult decision" for RCN to make. 335 F. Supp. 3d at 1048. WOW!, too, selected Comcast's direct representation based on "better financial terms." *Id.*

These statements are consistent with Comcast's position to directly solicit the business of MVPDs. When questioned by the Department of Justice, a Comcast executive acknowledged it was Comcast's "business practice" to inform MVPDs

that want "to get access to a Comcast controlled Interconnect, it has to hire Comcast as its ad sales representative" instead of a third-party rival. *Id.* at 1061. This does not reveal a forced purchase that neither RCN nor WOW! wanted. If anything, such evidence depicts "hard-nosed" business practices like those the Tenth Circuit noted but did not find anticompetitive in *Novell*, 731 F.3d at 1078 (finding email evidence may suggest "an uncharitable intent toward rivals" or even an "intent to undo a competitor," but did not show that conduct was "irrational but for its exclusionary tendencies"). None of this evidence "tends to exclude the possibility" that Comcast's conduct "was as consistent" with lawful conduct as with illegal tying conduct. *Mercatus Grp.*, 641 F.3d at 856.

Importantly, the internal documents the majority opinion references are dated 2014, when WOW! and RCN were still under exclusive contract with Viamedia but soliciting bids from other representatives to sell advertising avails on the Interconnects. While soliciting bids, RCN and WOW! engaged in back-and-forth negotiations with Comcast and Viamedia, leading ultimately to new contracts with Comcast. The timing of these discussions, as preserved in the record, is key. When reviewing the evidence here, this court is limited by the prospective nature of these then-ongoing negotiations. Our perspective is necessarily predictive not retrospective. These internal documents do not contain evidence of the economic impact *after* the negotiated deals were made, but only *before* when offers were being made, accepted, and rejected. They do not describe the economic results of these then-prospective relationships. Because of their prospective nature, they are not a reliable metric for understanding what has transpired since, but merely what the parties had hoped to achieve. Under our

antitrust regime, "[w]hat distinguishes exclusion from efficiency is what happens in the future," Easterbrook, *The Chicago School & Exclusionary Conduct*, at 443, not what the parties want to happen.

None of this evidence measures whether Comcast's conduct has resulted in a market injury, such as raised prices or decreased output. It does not show that RCN or WOW! understand their contracts with Comcast to be coercive or conditioned, and there is no evidence indicating RCN and WOW! are unhappy with their current relationship with Comcast. While viewing this evidence in Viamedia's favor, it is crucial to acknowledge its limitations in this case.

As the district court noted, the real "gravamen of Viamedia's tying claim [is] that Comcast's refusal to provide [Viamedia] Interconnect access prevents [Viamedia] from selling the kind of full-turnkey Ad Rep Services that WOW! and RCN desire." *Id.* at 1063 (internal quotations omitted). That differs from the paradigmatic tying claim, which requires conditioning and a forced sale to a *customer* rather than a withheld advantage from a *rival*. *See* 9 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1700a, p. 4. Antitrust law does not require Comcast to help Viamedia sell the same bundle it offers to their mutual customers. *See* 10 Areeda & Hovenkamp, ANTITRUST LAW ¶ 1748b, pp. 251–53 (no tied product "when the plaintiff's theory of injury is not that customers of the defendant's [tied] bundle would buy the items unbundled if they could, but rather that a rival could sell the *same bundle* if only the defendant would sell it a particular input").

Finally, even if Viamedia's refusal-to-deal claim had survived a motion to dismiss, summary judgment was appropriate on the tying claim because the undisputed facts do not show Comcast conditioned access to the Interconnects on the purchase of ad representation services. Although acknowledging that "[t]hese related claims are both based on the same course of conduct, resulted in the same anticompetitive harms, and would be subject to the same procompetitive justifications or defenses," Majority op. at p. 38, the majority opinion does not explain how Viamedia has established a distinct tying claim that should have advanced beyond summary judgment on its own merits. In framing its tying analysis, the majority opinion focuses on whether, when viewing Comcast's conduct as a whole, "[Comcast] has unreasonably maintained or enhanced its monopoly position." *Id.* at 73. While this framework would not necessarily reveal anticompetitive conduct in violation of § 2, I hesitate to apply it here for the simpler reason that our antitrust jurisprudence does not instruct us to do so. Instead, looking to the undisputed facts, Viamedia has failed to prove the elements of a tying claim.

To the extent the majority opinion also concludes that the existence of a viable refusal-to-deal claim saves Viamedia's tying claim, I am not convinced of that connection. In comparison to refusal to deal, tying is a form of exclusionary conduct with more specific requirements, which the district court noted. 218 F. Supp. 3d at 698 (a refusal-to-deal claim is different than a tying claim); *accord Novell*, 731 F.3d at 1072 (distinguishing unilateral refusals to deal from other recognized forms of anticompetitive conduct like tying). Viamedia, seeking an "escape route" and "trying to recast" Comcast's refusal to deal as unlawful tying conduct, *see Novell*, 731 F.3 at 1078, has treated these two claims interchangeably. But parties'

claims stand and fall on their own merits, so the district court was correct to consider them separately.

Conditioning, an essential element of tying, requires the forced sale of a product the buyer did not want. Based on the record before us, to which we are limited, there was no conditioning. Because the undisputed facts show no evidence of tying conduct separate from Viamedia's refusal-to-deal claim, I would affirm that portion of the district court's judgment.

### III.  Section 2 Monopolization Analysis

The majority opinion acknowledges Viamedia raised only two claims on appeal: refusal-to-deal and tying. Majority op. at p. 42 n.11. It also suggests an alternative means of § 2 recovery should Viamedia fail on either of its alleged claims. Per the majority opinion, Viamedia has sufficiently pleaded and presented evidence for the court to find an alternative § 2 monopolization claim. Such an open-ended approach may place courts in the role of the decision-maker on dense and complex economic issues better left to the free market. *See* Easterbrook, *The Chicago School & Exclusionary Conduct*, at 442 ("Markets are much better than judges at sifting efficient from anticompetitive practices."). We are no more skilled at predicting market shifts than anyone else, and courts are very rarely the best forum for discerning between exclusionary and efficient conduct. *See id.* at 442–45.

The district court hewed to the particular types of exclusionary conduct Viamedia alleged (tying and refusal to deal; its exclusive dealing claim was abandoned on appeal). The court found Viamedia had "affirmatively disavowed" any "free-standing" § 2 monopolization claim. 335 F. Supp. 3d at 1068. Having failed to plead or preserve an alternative claim

before the district court, Viamedia should not be entitled to pursue a vague § 2 monopolization theory on appeal. *King v. Kramer*, 763 F.3d 635, 641 (7th Cir. 2014) (this court not in a position to advance claims that party abandons or fails to preserve below); *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1225 (7th Cir. 1991) (an issue not "properly preserved below" in the district court is generally waived). Nor should the court be required to consider the restraint on trade or the impact on monopoly powers generally that may arise from Viamedia's allegations.

This rule is particularly relevant in antitrust law, which is susceptible to high rates of "false positives" that occur when the court confuses real competition with exclusion. *See* Easterbrook, *The Chicago School & Exclusionary Conduct,* at 445; *see also Microsoft Corp.*, 253 F.3d at 87 (discussing false positives). The new antitrust regime identifies problems like false positives, unpredictability, and past court confusion, and it seeks to protect consumers and promote competition in a technologically advancing marketplace. Many cases and authorities point in this direction. An alternative § 2 monopolization theory is not consistent with how courts now consider potentially exclusionary conduct. Accordingly, I am unable to join this portion of the majority opinion.

## IV. Conclusion

The majority opinion dives deep into this case's complicated facts and thoroughly covers swaths of antitrust law in an insightful manner. As Viamedia has plausibly alleged an anticompetitive refusal to deal, I join the majority in reversing and remanding on that claim. But the undisputed facts do not show an illegal tie, so summary judgment was proper on that

allegation. For the reasons above, I respectfully concur in part and dissent in part.